## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

MILAN PUSKAR HEALTH RIGHT,
LAWSON KOEPPEL, ALINA LEMIRE,
and CARRIE WARE,

<em>Plaintiffs</em>,

v.

BILL J. CROUCH, in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources,
JOLYNN MARRA, in her official capacity as
Interim Inspector General and Director of the
Office of Health Facility Licensure and
Certification, and STEVE HARRISON, in his
official capacity as Clerk of the House of
Delegates and Keeper of the Rolls,

<em>Defendants</em>.

Civil Action No. 3:21-cv-00370

Hon _____

## PLAINTIFFS' VERIFIED COMPLAINT FOR DECLARATORY
## AND EMERGENCY INJUNCTIVE RELIEF FOR CONSTITUTIONAL VIOLATIONS

In two weeks, on July 9, 2021, it is expected that West Virginia's Office of Health Facility Licensure and Certification[1] will promulgate an emergency rule to enforce a piece of legislation—Senate Bill 334—that is unconstitutional under both the United States Constitution and the West Virginia Constitution. Senate Bill 334—which requires existing organizations and people providing services regulated under the law to comply with the new law or face fines of up to $10,000 and the threat of a court-ordered injunction—is set to go into effect the very same day: July 9. It will not be until the moment that a state agency may enforce significant penalties against these providers that these providers will know what conduct might invoke the penalties.

The absence of adequate notice to providers of what conduct is or isn't sufficient to

---

[1] The Office of Health Facility Licensure and Certification operates within the Office of the Inspector General, which is a division within West Virginia's Department of Health and Human Resources, a state agency.

comply with the law is just one of many constitutional defects with Senate Bill 334. For this reason, and for reasons detailed more thoroughly below, enforcement of Senate Bill 334 (or "the Syringe Services Programs Act") will violate rights guaranteed to Plaintiffs under the United States Constitution and result in irreparable harm to Plaintiffs, and others like them: organizations and individuals that provide much-needed harm reduction services to their communities.[2] Senate Bill 334 also suffers such significant defects in violation of the West Virginia Constitution that the entire bill should be rendered fatally flawed.

Plaintiffs request, under 42 U.S.C. § 1983 and the historic equity powers of the federal courts, that this Court issue an emergency temporary restraining order, or, in the alternative, emergency preliminary injunctive relief, to enjoin immediately Defendant officials of the West Virginia Department of Health and Human Resources, the Office of the Inspector General, and OHFLAC from enforcing Senate Bill 334. For reasons illustrated further below, Plaintiffs also ask this Court to enjoin the House Clerk and Keeper of the Rolls from making corrections, adjustments, or amendments to the Syringe Services Programs Act.

## INTRODUCTION

On April 10, 2021, at approximately 10:05 p.m. and on the last day of the 85th regular session of the West Virginia legislature, lawmakers voted to pass Senate Bill 334,[3] legislation that could result in one of "most restrictive" state laws governing syringe service programs in the

---

[2] More than one program has closed or anticipates imminent closure of services. *See*, e.g., Lauren Peace, *WV health experts worry new law will ignite 'powder kegs' amid HIV outbreak*, MOUNTAIN STATE SPOTLIGHT (June 9, 2021), https://mountainstatespotlight.org/2021/06/09/wv-law-harm-reduction-hiv-outbreak/. "Lloyd White, who heads the Marion County Health Department, said his program would be permanently closing because of the new laws. 'We're still in the middle of a pandemic. I can't risk the fines. I just can't take a chance on a hit from our general health revenue,' White said. 'I think we're going to see an explosion of downstream effects. HIV, Hep C… all the things that these programs prevent.'"

[3] *See* History of Senate Bill 334, Exhibit A at Page 50.

country.[4]  The legislation would create a new article and sections of Chapter Sixteen of the West

Virginia Code: Sections 16-63-1, *et seq*.

The legislation, to be sure, would have a devastating impact on West Virginia, which is at

the center of an HIV crisis.[5] Syringe service programs—often referred to as needle exchanges—

are a powerful tool in stemming and preventing the spread of infectious diseases, including HIV,

Hepatitis C, and endocarditis.[6] The people who are served by syringe service programs are often

connected to care providers, and, when the syringe service program providers have built trust

with participants, many will elect to get tested for HIV and other infectious diseases, and be

connected with providers who can provide medical treatment.[7] These programs do, quite

literally, save lives.[8]

Although each of the constitutional defects with Senate Bill 334 identified in this

Complaint would be enough, on their own, to justify seeking emergency declaratory and

injunctive relief, it is the existence of another piece of legislation passed subsequent to Senate

---

[4] *See* Julia Lurie, *HIV is on the loose in West Virginia and so is a moral panic about needle exchanges*, MOTHER JONES (Apr. 8, 2021), https://www.motherjones.com/politics/2021/04/hiv-is-on-the-loose-in-west-virginia-and-so-is-a-moral-panic-about-needle-exchanges/  ("When it comes to harm reduction legislation, the legislation threatens to be 'among the most restrictive in the country,' said Corey Davis, an attorney at the Network for Public Health Law. He concluded, 'It would be a huge step backward.'").

[5] *See e.g.*, Caity Coyne, *CDC: Urgency Needed as Kanawha's HIV caseload is 'most concerning' in the U.S*," CHARLESTON GAZETTE-MAIL (Feb. 11, 2021) https://www.wvgazettemail.com/news/health/cdc-urgency-needed-as-kanawha-s-hiv-caseload-is-most-concerning-in-the-u-s/article_1161bd42-a3af-5b45-a7d7-5e6930a8baef.html.

[6] Syringe Services Fact Sheet, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/ssp/syringe-services-programs-factsheet.html

[7] See Declaration of Laura Jones.

[8] Lauren Peace, *Morgantwown Shows How Syringe exchanges save lives. But a bill before the West Virginia legislature would outla them*, MOUNTAIN STATE SPOTLIGHT (Feb. 21, 2021) https://mountainstatespotlight.org/2021/02/21/morgantown-shows-how-syringe-exchanges-save-lives-but-a-bill-before-the-west-virginia-legislature-would-outlaw-them/.

Bill 334 this session—legislation that is in effect now—that renders three key provisions of the Senate Bill 334 unenforceable, and which causes the Syringe Services Programs Act to collapse as a result.

In the final hours of legislative session, fewer than twenty minutes after the passage of Senate Bill 334, the West Virginia House of Delegates passed House Bill 2500, an act relating to "statewide uniformity for auxiliary container regulations."[9] While the subject matter of both pieces of legislation appear to be quite different, the two bills share something unique in common: Both Senate Bill 334 and House Bill 2500, upon their effective dates, *create identical sections of an identical article of the West Virginia Code*. House Bill 2500 plainly created a new article of Chapter 16 of the West Virginia Code and includes three sections: Sections 16-63-1 through Section 16-63-3. Senate Bill 334 purported to create the same new article—Sixty-three—of Chapter 16 of the West Virginia Code. Pursuant to the plain language of Senate Bill 334, on the date that the Syringe Services Act would become effective, it would create Sections 16-63-1 through Sections 16-63-10.

Both Senate Bill 334 and House Bill 2500 were passed by both houses of the legislature, and both were later signed by Governor Jim Justice into law.[10] Senate Bill 334 is set to go into effect on July 9. House Bill 2500 went into effect immediately upon passage on April 10 and is now the law.[11]

---

[9] *See* History of House Bill 2500, Exhibit B at page 10.

[10] *See Letters from Governor Jim Justice to Secretary Mac Warner Enclosing for Filing Senate Bill 334 and House Bill 3500*, JOURNAL OF THE SENATE, 85th Legislature, Regular Session, at Pages 495, 509.  Exhibits D and E.

[11] In an attempt to avoid confusion, provisions of Senate Bill 334 that are identical to section numbers in House Bill 2500 will be referred to, when necessary, as *Purported* Sections 16-63-1, *et. seq.* The laws created by House Bill 2500 and currently in effect will be referred to Sections 16-63-1, *et. seq.*

The legislature did not expressly or impliedly suggest, prior to passage, that the intent was for one statute to repeal or supersede the other. The Governor, given the opportunity to review both pieces of legislation prior to signing each into law, did not identify issues significant enough to send either piece of legislation back to the legislature noting objections, as is custom and congruent with the authority he is granted under the state constitution, that would need to be resolved prior to his signing.

If what remains of the Syringe Services Programs Act—Sections 16-64-4 through 16-63-10— is to go into effect on July 9, there will be no provisions in the law to define key terms in the legislation, to specify what may be required of applicants, or list what services a syringe service distribution program must comply with to avoid substantial penalties. The absence of these significant provisions is fatal to the bill, rendering it so vague as to be in violation of the due process rights of providers as guaranteed by the Fourteenth Amendment of the United States Constitution.

Further, the Syringe Services Programs Act requires existing providers immediately comply with certain provisions of the Act or shut down services. However, the regulating agency, OHFLAC, does not have lawful authority to promulgate rules in advance of the effective date of the Act and therefore cannot provide constitutionally required notice to providers on what conduct is sufficient to avoid the harsh penalties imposed by noncompliance.[12]  On July 9, providers of syringe service programs will either be forced to stop providing services in fear of

---

[12] While the statute provides a provision directing OHFLAC to promulgate an emergency rule by July 1, the statute *itself* is not effective until July 9, eight days later, and there is no indication that OHFLAC, the Office of the Inspector General, or DHHR intend to issue an emergency rule prior to the effective date of the statute. A lawful grant of authority by the legislature to an executive agency to promulgate rules by July 1 would ostensibly require either (1) the Act to go in effect on or before July 1; or (2) a separate piece of enabling legislation granting the executive agency authority to promulgate rules in advance of the legislation's effective date.

penalties or will move forward in providing services without clarity as to whether their programs meet the Syringe Service Programs Act's requirements.

Plaintiffs represent the spectrum of people and organizations providing services that will be irreparably harmed by the enforcement of the Syringe Services Programs Act.

## PARTIES

1.      Plaintiff Carrie Ware is a resident of Huntington, West Virginia. Ms. Ware provides free services to local low-income and marginalized people and communities via her own efforts and in association with other grassroots organizations and outreach programs. These services have included distribution of naloxone—a medication that rapidly reverses the effects of an opioid overdose—as well as assistance to people experiencing homelessness. Ms. Ware's services have also included the limited provision of sterile syringes to people in her community, including people who use drugs. Huntington has been home to HIV "clusters," and the people with whom Ms. Ware works have been disproportionately affected. Given the uncertainty of when Senate Bill 334 went into effect and how it might apply to her distribution of syringe services, as well as the threat of significant fines, Ms. Ware has had to stop offering those services. Ms. Ware would resume limited syringe service distribution if SB 334 does not go into effect. *See* Declaration of Carrie Ware, submitted with the Complaint.

2.      Plaintiff Milan Puskar Health Right is a free health care clinic for residents of West Virginia who are low-income and uninsured or underinsured. Milan Puskar Health Right is located in Morgantown, West Virginia. Milan Puskar Health Right is a 501(c)(3) organization. Milan Puskar Health Right offers a number of services, including specialty clinics focused on health issues including diabetes, infectious diseases, cardiology, psychiatry, and HIV testing. The organization also offers mental health services and dental care. Milan Puskar Health Right also

offers the "LIGHT" (Living in Good Health Together) program, which provides to clients services including medical attention, sterile syringes on "needs-based" basis, alcohol swabs, and referrals to additional services. The syringe service program also provides, when necessary, sterile syringes to people with diabetes who do not have coverage for the purchase of sterile syringes, or for example, people who need sterile syringes for the injection hormones. The program was started after a year and a half of research and "create[s] a non-judgmental environment for people with addiction to begin to see there is hope for change." The program is designed to "reduce the transmission of diseases in [the] community through harm reduction, and, hopefully, sav[e] lives."[13] Laura Jones is the executive director of Milan Puskar Health Right. *See* Declaration of Laura Jones, submitted with the Complaint.

      3.    Plaintiff Lawson Koeppel is a Virginia resident who provides outreach and services to marginalized, stigmatized, and criminalized populations in Appalachia, including West Virginia, and advocates for the development and implementation of evidence-based solutions to address the adverse effects of drug use. Mr. Koeppel's support for West Virginians has previously included syringe service distribution, and has provided sterile syringes to other harm reductions and to people who use drugs in West Virginia. Given the uncertainty of when Senate Bill 334 went into effect and how it might apply to distribution of syringe services as well as the the threat of significant fines, Mr. Koeppel has stopped syringe service distribution services. He would resume syringe service distribution if Senate Bill 334 does not go into effect *See* Joint Declaration of Lawson Koeppel and Alina Lemire, submitted with the Complaint.

      4.    Plaintiff Alina Lemire is a Virginia resident who works with Plaintiff Koeppel provides outreach and services to marginalized, stigmatized, and criminalized populations in

---

[13] *LIGHT Program*, Milan Puskar Health Right, https://mphealthright.org/light-program.

Appalachia, including West Virginia, and advocates for the development and implementation of evidence-based solutions to address the adverse effects of drug use. Her support for West Virginians has previously included syringe service distribution, and has provided sterile syringes to other harm reductions and to people who use drugs in West Virginia. Given the uncertainty of when Senate Bill 334 went into effect and how it might apply to distribution of syringe services as well as the threat of significant fines, Ms. Lemire has stopped syringe service distribution services. She would resume syringe service distribution if Senate Bill 334 does not go into effect. *See* Joint Declaration of Lawson Koeppel and Alina Lemire, submitted with the Complaint.

5.      Defendant Bill J. Crouch is the Secretary of the West Virginia Department of Health and Human Resources, the state agency with authority over several divisions within DHHR, including the Office of the Inspector General. He is the head of that agency. He is sued in his official capacity.

6.      Defendant Jolynn Mara is the Interim Inspector General at the Office of the Inspector General, the Division which oversees the Office of Health Facility and Licensure. She serves a dual role as the Director of OHFLAC, the office charged with enforcing state licensure rules and federal certification regulations. Defendant OHFLAC is the state entity directed to promulgate regulations in accordance with SB 334 and is the entity that will be required to enforce any regulations that it promulgates against syringe service programs. She is sued in her official capacity.

7.      Defendant Steve Harrison is the Clerk of the House of Delegates and the Keeper of the Rolls.  Pursuant to Section 4-1-13 of the West Virginia Code, Defendant Harrison—in his role as House Clerk and Keeper of the Rolls—records bills or joint resolutions "in a well-bound book, to be kept for that purpose exclusively, which recording shall be equivalent to enrollment."

Section 4-1-13 further directs the Keeper of the Rolls to provide an index of acts and resolutions to be prepared for publication and "shall superintend" the printing "thereof." Pursuant to newly-amended House Rule 20, the clerk "is authorized to correct errors and omissions prior to the final printing of legislative documents or publications." He is sued in his official capacity.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331, 1343 because Plaintiffs seek redress for the deprivations of rights guaranteed by the Constitution of the United States.

9.      This Court has personal jurisdiction over Defendants because they are domiciled in West Virginia and because their denial of Plaintiffs' rights under the United States Constitution occurred in West Virginia.

10.     This is an action for injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 to protect the rights of Plaintiffs' as guaranteed to them under the Fourteenth Amendment to the United States Constitution.

11.     This Court has supplemental jurisdiction over Plaintiff's claims for rights protected under the West Virginia State Constitution pursuant to 28 U.S.C. § 1367. Venue is proper in the United States District Court in Southern District, Huntington Division because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## STATEMENT OF THE FACTS

***Senate Bill 334, House Bill 2500, and conflicting Sections 16-63-1, et. seq.***

12.     Senate Bill 334, relating to Syringe Services Programs, was filed for introduction on February 18, 2021.  *See* Exhibit A at page 39.

13.     Senate Bill 334 passed both chambers on April 10, 2021, the final day of legislative session. *Id.* at pages 50, 52-53.

14.     The governor signed Senate Bill 334 on April 15, 2021. Exhibit C.

15.     Although there is conflicting language to the contrary within the legislation, the legislation that the governor signed into law on April 15 states that it is effective 90 days from passage, or July 10, 2021. Exhibit A at page 1.

16.     The title of the Bill, as it was passed and signed into law, is stated as follows:

> AN ACT to amend the Code of West Virginia, 1931, as amended, by adding thereto a new article, designated §16-63-1, §16-63-2, §16-63-3, §16-63-4, §16-63-5, §16-63-6, §16-63-7, §16-63-8, §16-63-9, and §16-63-10, all relating to syringe services programs; defining terms; providing license application requirements and process; establishing program requirements; providing procedure for revocation or limitation of the syringe services programs; setting forth administrative due process; providing for administrative and judicial appeal; establishing reporting requirements and renewal provisions; providing for rulemaking; providing criminal immunity in certain circumstances; providing civil immunity in certain circumstances; providing for expungement; providing immunity from professional sanction, detainment, arrest, or prosecution in certain circumstances; providing for administrative penalties and allowing Office of Health Facilities Licensure and Certification to seek injunctive relief; requiring a syringe services program to coordinate with health care providers; requiring that a syringe services program that is closing to post notice and provide transition care plan for individuals; requiring the Bureau of Medical Services to amend the state plan; and providing for effective date.

17.     House Bill 2500—legislation designed "to establish uniformity for auxiliary container regulations"—was introduced by legislators in the West Virginia House of Delegates on February 15, 2021. *See* Exhibit B at Page 1.

18.     House Bill 2500, like Senate Bill 334, was passed on the final day of legislative session: April 10, 2021. *Id.* at Page 10.

19.     Both the Senate and the House voted to make House Bill 2500 effective "upon passage." *Id.* at Pages 10-11.

20.     Therefore, House Bill 2500 was in effect on the evening of April 10, 2021, the moment after the House of Delegates passed the legislation.

21.     The governor signed House Bill 2500 into law on April 15, 2021. Exhibit D.

22.     The title of the bill, as it was passed and signed into law, states the following:

> AN ACT to amend the Code of West Virginia, 1931, as amended, by adding thereto a new article, designated §16-63-1, §16-63-2, and §16-63-3, all relating to establishing statewide uniformity for auxiliary container regulations.

> *See* Enrolled Bill 2500, Exhibit B at pages 5-9.

23.      Absent the provisions with the identical designations in Senate Bill 334—§§ 16-63-1, 16-63-2, and 16-63-3—the rest of Senate Bill 334 falls apart. There is no way for an "ordinary person" to "understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

24.     The penalties of non-compliance with Senate Bill 334 are significant: the Office of Health Licensure and Certification will have the authority to assess up to $10,000 "per violation" of the Syringe Services Program Act, and the agency may also seek injunctive relief in a court of law. Exhibit A at Page 8.

25.     Such significant penalties are so "prohibitory and stigmatizing" that they could be deemed "quasi-criminal." *Hoffman Estates v. Flipside*, 455 U.S. 489, 499, 102 S. Ct. 1186, 1194 (1982).

***Senate Bill 334's "Section Ten" provision regarding "coordination of care."***

26.     The final section of Senate Bill 334 is titled "Coordination of Care." Exhibit A at page 11.

27.     Section 10 requires that any program "shall coordinate with other health care providers in its services to render care as set forth in the program requirements." *Id.*

28.     The section states as follows:

**§16-63-10. Coordination of care.**

(a)  A syringe service program shall coordinate with other health care providers in its services to render care to the individuals as set forth in the program requirements.

(b)  In the event that the syringe services program is closed, the syringe services program shall notify the participant of the closure of the service, prior to closure, in a conspicuous location, and provide an individual with a transition care plan.

(c)  The Bureau for Medical Services shall submit a state plan amendment to permit harm reduction programs to be an eligible provider, except that the syringe exchange services shall not be eligible for reimbursement under the state plan.

(d)  Upon passage, any existing provider not offering the full array of harm reduction services as set forth in this section shall cease and desist offering all needle exchange services.  Any provider offering the full array of harm reduction services shall have until January 1, 2022, to come into compliance with this section. Any new provider shall have until January 1, 2022, to come into compliance with the provisions of this section.

        *Id.*

29.     The section further states that "any existing provider not offering the full array of harm reduction services as set forth in this section shall cease and desist offering all needle exchange services." *Id.*

30.     The word "section" refers to the text within the provision "10" in 16-63-10. Section 16-63-10 means Section 10 of Article 63 of Chapter 16 of the West Virginia Code.

31.    While the section does not provide for services, it does require "coordination of care" and that a "syringe service program shall notify the participant[s] of the closure of the service," prior to ceasing services. *Id.*

32.     In the event that a program is not in "compliance" with Section 10, it will face the threat of significant fines issued by OHFLAC or the possibility of an injunction sought in court. *Id.*

33.    Section 10 is vague as to what "services" are required of programs to avoid these significant penalties, beyond providing referrals and posting notices for closure.

34.    Section 10 further provides that any existing provider must come into compliance with Section 10 "upon passage." *Id.*

35.    The term "upon passage" refers to the moment after both houses of the legislature voted to pass legislation.

36.    "Upon passage" would refer to the evening of April 10, 2021.  *See, e.g.*, *City of Benwood v. Bd. of Educ.*, 212 W. Va. 436, 439, 573 S.E.2d 347, 350 (2002) (noting that "passage" of a bill by the West Virginia Legislature refers to the date on which the bill has passed both houses of the legislature).

37.    Given that the Syringe Services Program Act also provides that it will not go into effect until July 9, 2021, it is unclear to providers at what point they may not be in compliance with the Act, and thus face significant penalties.

38.    Section 10 does not provide guidance sufficient that an "ordinary [person] can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

39.     Section 10 arbitrarily discriminates against "existing providers." Section 10 states "Upon passage, any **existing provider** not offering the full array of harm reduction services as set forth in this section **shall cease and desist offering all needle exchange services**.  Any provider offering the full array of harm reduction services shall have until January 1, 2022, to come into compliance with this section. Any **new provider** shall have **until January 1, 2022**, to come into compliance with the provisions of this section." (emphasis added). Exhibit A at page 11.

40.     Although "legislation is presumed to be valid and will be sustained if the classification is presumed to be valid and will be sustained if the classification is related to a legitimate state interest," there is no basis in the law or in the legislative history of the Act to justify requiring an "existing provider," who may already have some, if not all, infrastructure in place, from a "new provider," who could ostensibly begin providing services for the first time on July 9 without having to comply with any other provisions of the Act.

*Lack of "Fair Notice" in Senate Bill 334's Title*

41.     Senate Bill 334 fails to express in its title the full effect of the legislation.

42.     The title of Senate Bill 334 fails to provide a "pointer" to one of the most burdensome provisions of the statute: a requirement that applicants for licensure under the Act obtain "a written statement of support from a majority of the members of the county commission *and* a majority of the members of the governing body of a municipality in which it is located or is proposing to locate." (emphasis added.)

43.     The title of the Act is specific in that it provides pointers to other substantive provisions of the act, including reporting requirements, administrative due process rights, and penalties.

44.     The failure to express the "local approval" requirement in the title is misleading and does not put an interested person on notice so that it would be fully informed of its requirements and purpose.

***Senate Bill 334's Title Embraces Multiple Subjects***

45.     Senate Bill 334 embraces more than one subject, or "object," in the title: the reference to sections 16-63-1 through 16-63-3 relate "to the use, dispositions, and sale of auxiliary containers."

46.     The references to Sections 16-63-4 through 16-63-10 relate to restricting syringe service programs.

47.     As of the time of this filing, if an interested party were to view Enrolled Bill 334 on the West Virginia Legislature website, links to Section 16-63-1 through Section 16-63-3 would refer the party to sections of the Code entirely unrelated to the regulation of syringe service programs.[14]

***The Limits of OHFLAC's Statutory Authority***

48.     Senate Bill 334 directs the Office of Health Licensure and Certification to promulgate an emergency rule "by July 1, 2021" that would "effectuate the provisions of this article in accordance with evidence-based practices." Exhibit A at page 10.

49.     Senate Bill 334 is not set to go into effect until July 9, 2021.

50.     There is not a separate statute that is in effect or would go into effect prior to July 1, 2021 to enable or authorize OHFLAC to promulgate rules.

---

[14] The enrolled version of Senate Bill 334 is available on the website of the West Virginia Legislature, at https://www.wvlegislature.gov/Bill_Status/bills_text.cfm?billdoc=SB334%20SUB1%20ENR.htm&yr=2021&ssstype=RS&i=334 (last visited June 25, 2021).

51.     Therefore, despite the directive in the statute, OHFLAC cannot and is not expected to promulgate a rule prior to July 9, 2021, the first day on which the Syringe Services Program Act will go into effect and the first day on which providers will be subject to significant fines and the threat of injunctive relief for noncompliance.

***Irreparable Harm***

52.     Once the Syringe Services Program Act goes into effect, the lack of clarity within the bill ensures that Plaintiffs who have paused services will have to cease completely or face the threat of significant fines or injunctive relief.

53.     Although Plaintiff Milan Puskar Health Right expects to be able to continue to offer some level of syringe service distribution, the vagueness of the bill and the lack of guidance to providers will result in Plaintiff restricting services further than required under the law because of fear of significant fines and injunctive relief.

54.     The enforcement of the restrictions provided for in Senate Bill 334 will also result in Plaintiff Milan Puskar Health Right having "fewer opportunities to prevent the spread of diseases including HIV, endocarditis, and Hepatitis C," due to both restricted access to sterile syringes and by not having opportunities to refer patients who will no longer come to the program for testing and care.  *See* Declaration of Laura Jones.

55.     If Senate Bill 334 is enforced, Plaintiff Milan Puskar Health Right also risks decreases in funding from government and private funders, in part because many funders and the federal government (which provides funding for support services but not the purchase of sterile syringes) are more supportive of programs that follow CDC best practices. *Id.*

## THE NEED FOR IMMEDIATE INJUNCTIVE RELIEF

56.     Upon information and belief, OHFLAC will not have the authority to promulgate and enforce rules to significantly restrict syringe exchange programs until July 9, the day on which the Syringe Services Programs Act is set to go into effect.

57.     The fear of enforcement of Senate Bill 334 has, due to the bill's vagueness and strict requirements, forced some syringe service providers to shut down in fear that they may not be in compliance with the law. Others will have to shut down or significantly adjust their services in order to be in compliance with the law. This will result in inability or restricted ability to serve clients and result in a loss of attendance and connection to vital medical services by participants. It may also result in a loss of funding to programs which are not following CDC best practices.

## CLAIMS AND CAUSES OF ACTION

### COUNT I
### DEPRIVATION OF DUE PROCESS FOR VAGUENESS IN VIOLATION OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

58.     Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

59.     Plaintiffs assert that the Syringe Services Programs Act is unconstitutional on its face and in deprivation of due process rights guaranteed by the Fourteenth Amendment of the United States Constitution.

60.     Plaintiffs also assert that the Syringe Services Programs Act is unconstitutional as applied to each Plaintiff.

61.     Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief.

62.     The Fourteenth Amendment provides:

No State shall…deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, Section 1.

63.    "The void-for-vagueness doctrine requires either "a penal statute [that] define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson*, 461 U.S. 352, 357 (1983), or a statute with a civil penalty the effect of which is so "prohibitory and stigmatizing," that it could be deemed "quasi-criminal," *Hoffman Estates v. Flipside*, 455 U.S. 489, 499, 102 S. Ct. 1186, 1194 (1982).

64.    The effect of the civil fines and injunctive relief imposed by Senate Bill 334 would be "prohibitory and stigmatizing." The threat of a fine of up to $10,000 and loss of licensure, will ensure that many programs, will cease to operate at all.

65.    Additionally, the effect of a violation of injunctive relief would be criminal in nature. *See State ex rel. UMWA Int'l Union v. Maynard*, 176 W. Va. 131, 134, 342 S.E.2d 96, 99 (1985). "'Whether the proceedings are civil or criminal, a contempt of court is in the nature of a criminal offense . . .''

66.    Therefore, the void-for-vagueness doctrine should apply to the civil fine and injunctive relief prescribed by Senate Bill 334.

67.    The first three provisions of Senate Bill 334 are void, because the proposed Sections 16-63-1 through 16-63-3, under which Senate Bill 334 would provide for definitions, application guidelines, and program requirements, share the same article and section numbers as legislation that went into effect on April 10, 2021 and already has the force of law.  Without key provisions outlining definitions, application guidelines, and program requirements, Senate Bill 334 does not "define with sufficient definiteness that ordinary people can understand what

18

conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory

enforcement."

68.    Sections 16-63-1 through 16-3-3 of the West Virginia Code, which have been in

effect since April 10, 2021, relate to the permissibility of municipal ordinances regulating "the

use, disposition, or sale of auxiliary containers."

69.    The provisions state as follows:

> **Section 16-63-1. Definitions.**
> As used in this article:
> "Auxiliary container" means a bag, cup, bottle, or other packaging,
> whether reusable or single-use, that meets both of the following
> requirements:
>> (1) Is made of cloth, paper, plastic, cardboard,
>> corrugated material, aluminum, glass, postconsumer
>> recycled material, or similar material or substrates,
>> including coated, laminated, or multilayer substrates.
>> (2) Is designed for transporting, consuming, or
>> protecting merchandise, food, or beverages from or
>> at a food service or retail facility.
> "Local unit of government" means a county, municipality, or city.
>
> **Section 16-63-2. Local Ordinance Requirements.**
> Subject to §16-63-3 of this code, a local unit of government may not adopt or
> enforce an ordinance that does any of the following:
>> (1) Regulates the use, disposition, or sale of auxiliary
>> containers.
>> (2) Prohibits or restricts auxiliary containers.
>> (3) Imposes a fee, charge, or tax on auxiliary
>> containers.
>
> **Section 16-63-3. Ordinances Permitted.**
> (a) §16-63-2 of this code may not be construed to prohibit or
> restrict any of the following:
>> (1) A curbside recycling program.
>> (2) A designated residential or commercial recycling
>> location.
>> (3) A commercial recycling program.
> (b) §16-63-2 of this code does not apply to any of the following:
>> (1) An ordinance that prohibits littering, as described
>> in §22-15A-2 of this code.
>> (2) The use of auxiliary containers on property owned by a
>> local unit of government.

Exhibit B at pages 7-8.

70.     On July 9, 2021, Sections 16-63-4 through 16-63-10, relating to restrictions on syringe service programs, are set to go into effect.

71.     These sections rely on definitions, application guidelines, and program requirements that are not provided for in 16-63-1 through 16-63-3, laws currently in effect relating to restrictions on municipal ordinances regarding the use, sale, or disposal of auxiliary containers.

72.     For example, Section 16-63-4 of the Syringe Services Program Act provides that a syringe services program may face penalties under the statute if "an inspection indicates the syringe services programs is in violation of the law or legislative rule." Exhibit A at Page 6. However, a program cannot understand what a violation of the law is without an enforceable section of the Code providing what precisely is required of the program.

73.     The Syringe Services Program Act fails to define "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *See Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 1858 (1983).

74.     Further, even if the Syringe Services Program Act could be enforced without providing for definitions, application guidelines, and program requirements, Section 16-63-10 of the Syringe Services Program Act does not provide sufficient information such that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

75.     Section 16-63-10, "Coordination of care," outlines the appropriate procedures for closure and for coordinating with health providers. Section 16-63-10 states:

> **Upon passage**, any existing provider not offering the full array of
> harm reduction services as set forth **in this section** shall cease and
> desist offering all needle exchange services.  Any provider offering
> the full array of harm reduction services shall have until January 1,
> 2022, to come into compliance **with this section**. Any new provider
> shall have until January 1, 2022, to come into compliance with the
> provisions **of this section**. (Emphasis added.)

Exhibit A at Page 9.

76.     "Passage," under West Virginia law, refers to the time when a piece of legislation

has passed both chambers of the legislature.

77.     While Senate Bill 334 passed both chambers of the legislature on April 10, 2021,

it is not scheduled to go into effect until July 9, 2021.

78.     Because of this conflict, it is unclear as to precisely the date at which when, under

the legislation, syringe service programs that do not provide the full array of services are subject

to significant fines or a judicial action wherein the government seeks injunctive relief.

79.     Even in the event that there was sufficient clarity with regard to the date by which

syringe service program providers must comply, Section 16-63-10 provides no notice to

providers as to what conduct is prohibited or sanctioned within the section.

80.     While the section does not provide for services, it does require "coordination of

care" and that a "syringe service program shall notify the participant[s] of the closure of the

service," prior to ceasing services. Exhibit A at page 9.

81.      In the event that a program is not in "compliance" with Section 10, it will face

the threat of significant fines issued by OHFLAC or the possibility of an injunction sought in

court.

82.     Section 10 is vague as to what "services" are required of programs to avoid these

significant penalties, beyond providing referrals and posting notices for closure.

21

83.     Further, even if the Syringe Services Program Act did not suffer the significant constitutional deficiencies as described above, there will be no regulations with the force of law to provide sufficient guidance to providers prior to July 9, the date that the Act goes into effect.

84.     Any regulations promulgated by the Office of Health Facility Licensure & Certification prior to that time would have no effect under the law because there is not an enabling statute effective prior to July 9 that would grant OHFLAC that authority. Without these regulations, there is not sufficient guidance such that "that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."

85.     For these reasons, the Syringe Services Act fails to define "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *See Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 1858 (1983).

## COUNT II
## VIOLATION OF PROCEDURAL DUE PROCESS RIGHTS
## AS GUARANTEED BY THE FOURTEENTH AMENDMENT
## OF THE UNITED STATES CONSTITUTION

86.     The Fourteenth Amendment prohibits state actors from depriving an individual of life, liberty, and property without due process of law.

87.     Included within this protection are the rights to notice and a hearing when the state deprives an individual of fundamental property interests.

88.     Plaintiffs have fundamental property interests in continuing to provide syringe distribution services.

89.     Senate Bill 334 requires "any existing provider" not providing the full array of harm reduction services to "cease and desist" upon passage of the bill.

22

90.     Senate Bill 334 does not go into effect until July 9, but "upon passage" refers to the date on which the legislation passed both houses of the legislature, which was April 10.

91.     Syringe service providers have been forced to close or will be forced to close on July 9 without notice or opportunity for a hearing.

92.     The legislation further provides that "in the event a syringe services program is closed," the syringe services program "shall notify the participant of the closure of the service, prior to closure, in a conspicuous location, and provide an individual with a transition care plan." Exhibit A at page 9.

93.     Providers, if forced to cease services immediately, will be unable to comply with the statute by providing notice to participants of the service "prior to closure," and will thus be subject to OHFLAC penalties without a notice or hearing regardless if they *do* cease services on July 9 but fail to provide a notice prior to closure, or if they *don't* cease services, even if not in compliance with other provisions of the Act, in order to provide appropriate notice of closure.

94.     Either violation will be without notice or opportunity for a hearing.

## COUNT III
## VIOLATION OF THE EQUAL PROTECTION CLAUSE
## OF THE FOURTEENTH AMENDMENT
## OF THE UNITED STATES CONSTITUTION

95.     Plaintiffs incorporate all previous paragraphs by reference.

96.     Although "legislation is presumed to be valid and will be sustained," it must be "related to a legitimate state interest."

97.     The provision allowing "new" providers until January 1, 2021 to comply with Section 10 of Senate Bill 334 while requiring existing providers who do not provide all services required by Senate Bill 334 is not related to a legitimate state interest and thus violates the equal protection clause of the United States Constitution.

## COUNT IV
## VIOLATION OF THE EXPRESSIVE TITLE REQUIREMENT OF THE ONE-OBJECT RULE OF THE WEST VIRGINIA CONSTITUTION

98.     The above paragraphs are incorporated by reference herein.

99.     The West Virginia Constitution, Article VI, Section 30, provides that: "No act hereafter passed, shall embrace more than one object, and that shall be expressed in the title."

100.    The enactment of the Enrolled Senate Bill 334 violates the one-object rule of the West Virginia Constitution because the title of Senate Bill 334 does not impart enough information to one interested in the subject matter to provoke a reading of the Act.

101.    The Act requires applicants to "[p]rovide a written statement of support from a majority of the members of the county commission and a majority of the members of a governing body of a municipality in which it is located or is proposing to locate." Exhibit A at page 3.

102.    A person reading the title of the bill would have no reason to conclude that the legislation touches the subject of local control.

103.    The flaw is fatal to the bill and must cause the entire bill to fail.

## COUNT V
## SECOND VIOLATION OF THE ONE-OBJECT REQUIREMENT OF THE WEST VIRGINIA CONSTITUTION

104.    The above paragraphs are incorporated by reference herein.

105.    The West Virginia Constitution, Article VI, Section 30, provides that: "No act hereafter passed, shall embrace more than one object, and that shall be expressed in the title."

106.    The enactment of the Enrolled Senate Bill 334 violates the one-object rule of the West Virginia Constitution because the title of Senate Bill 334 embraces two unrelated objects: (1) statewide uniformity of auxiliary container regulations, and (2) syringe service programs.

107.     The one-object rule exists in part to provide "fair notice," and "the purpose of procedure is to enhance the rationality of the deliberative process." *C.C. "Spike" Copley Garage v. Pub. Serv. Comm'n*, 171 W. Va. 489, 493, 300 S.E.2d 485, 489 (1983).

108.     "If a title includes both subjects of legislation embraced in the act, "the whole act must fall for the very sufficient reason that it is improper for the Court to choose between the two." *Simms v. Sawyers*, 85 W. Va. 245, 255, 101 S.E. 467, 472 (1919).

109.     A person reading the title of the bill would have no reason to conclude that the legislation touches the subject of local control.

110.     The flaw is fatal to the bill and must cause the entire bill to fail.

### COUNT VI
### UNCONSTITUTIONAL USE OF AUTHORITY IN VIOLATION OF THE SEPARATION OF POWERS DOCTRINE OF THE WEST VIRGINIA CONSTITUTION BY DEFENDANT CLERK OF THE HOUSE OF DELEGATES AND KEEPER OF THE ROLLS

111.     Newly-amended House Rule 20 authorizes the Clerk of the House of Delegates and Keeper of the Rolls "to correct errors and omissions prior to the final printing of legislative documents or publications."[15]

112.     Upon information and belief, the Office of the Clerk of the House of Delegates and Keeper of the Rolls:

>          (1)     May unilaterally seek to amend Chapter 16 of the West Virginia Code that would provide for a new article either the Syringe Services Act or the Act relating to auxiliary containers; or,

---

[15] House Rule 20 provides in full: "The Clerk shall have supervision and charge of all printing done for the House and the printer shall print only such documents and other matter as the Clerk authorizes. The Clerk is authorized to correct errors and omissions prior to the final printing of legislative documents or publications." W. Va. HR 1.

(2)    Has *already* taken steps to amend Chapter 16 of the West Virginia Code to

provide for a new article for either the Syringe Services Act or the Act relating to

auxiliary containers.

113.    Such action would not only extend well beyond the correction of "errors and

omissions," but it would unlawfully invade the province of the executive branch by amending a

chapter of the state code after the legislation has been passed by both houses and, upon review,

signed into law by the governor.

114.    The use of authority granted under House Rule 20, as applied, is in violation of

Article Six, Section 31 of the West Virginia Constitution, which requires that amendments to a

bill shall be voted on by both chambers of the legislature, requiring an affirmative vote of a

majority of all members of each house.

115.    Article 7, Section 14 of the West Virginia Constitution provides:

> ". . .[E]very **bill passed by the Legislature shall, before it becomes
> a law, be presented to the governor. If he approves, he shall sign
> it, and thereupon it shall become a law; but if not, he shall return
> it, with his objections, to the house in which it originated**, which
> house shall enter the objections at large upon its journal, and may
> proceed to reconsider the returned bill. (emphasis added.)

116.    This provision of the state constitution provides the exclusive authority of the

Governor to sign a bill into law, to veto it, or to return it, with any objections, to the house in

which it originated.

117.    In fact, in previous years, and congruent with the authority that has been

delegated to the executive by the state constitution, it has been ordinary practice for the Governor

to return to the legislature bills with objections, including objections relating to title deficiencies

or typographical issues. *See e.g.*, Exhibit E, *Letter from Governor Justice to Secretary Mac

Warner Re: Enrolled Committee Substitute for House Bill 2734* (Mar. 27, 2019) (vetoing and

26

returning a bill to the legislature based on technical flaws, including erroneous cross references);
Exhibit F, *Letter from Governor Justice to Secretary Mac Warner Re: Enrolled Committee
Substitute for House Bill 2703* (Mar. 27, 2019) (disapproving and returning legislation because
the bill amended W. Va. Code Section 11-4C-30 while the title stated that it amended a different
section, Section 11-14-10) Exhibit G, *Letter from Governor Justice to Secretary Mac Warner
Re: Enrolled Committee Substitute for House Bill 2807* (Mar. 27, 2019) (vetoing bill based on a
"technical error" after subsections of the at-issue legislation were changed, "thereby changing
the meaning of [the bill]).

118.    After the governor signs a bill into law, the House Clerk and Keeper of the Rolls
has no authority to create a new article of a section of the West Virginia Code.

119.    Such an action would require the House Clerk and Keeper of the Rolls to assume
some intent on behalf of the Office of the Governor that a thorough review of the legislation was
not conducted prior to the Governor signing the legislation into law.

120.    Any use of authority granted under House Rule 20 as applied to Senate Bill 334
would be unconstitutional.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter orders and a
judgment:

121.    Declaring that the provisions of and enforcement by Defendants of the Syringe
Services Programs Act as discussed above violate Plaintiffs' rights under the Equal Protection
and Due Process Clauses of the Fourteenth Amendment;

122.    Declaring that the Syringe Services Act is on its face void for vagueness and
unenforceable;

123.    Declaring that the title of Senate Bill 334 is in violation of the "one-object" rule of the West Virginia Constitution and that the Syringe Services Programs Act is void and unenforceable;

124.    Declaring that any power exercised by Defendants DHHR, the Office of the Inspector General, and OHFLAC prior to July 9 is void and unenforceable;

125.    Declaring that any action by the Office of the Clerk of the House of Delegates and the Keeper of the Rolls with regards to Senate Bill 334 or the Syringe Services Act after the Governor signed the Act into law is unconstitutional in violation of the separation of powers doctrine of the West Virginia Constitution and therefore such action or such prospective action is void and unenforceable;

126.    Issuing immediate emergency and injunctive relief;

127.    Permanently enjoining Defendants from enforcing SB 334;

128.    Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

129.    Awarding Plaintiffs costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

130.    Granting such other and further relief as the Court deems just and proper.

**Respectfully submitted,**

**by Counsel,**

/s/ Loree Stark _____
Loree Stark
West Virginia Bar No. 12936
ACLU of West Virginia Foundation
P.O. Box 3952
Charleston, WV 25339-3952
(914) 393-4614
lstark@acluwv.org