| | |
|---|---|
| MILAN PUSKAR HEALTH RIGHT, LAWSON KOEPPEL, ALINA LEMIRE, and CARRIE WARE,<br><br>                           *Plaintiffs*,<br><br>v.<br><br>BILL J. CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources, JOLYNN MARRA, in her official capacity as Interim Inspector General and Director of the Office of Health Facility Licensure and Certification, and STEVE HARRISON, in his official capacity as Clerk of the House of Delegates and Keeper of the Rolls,<br><br>                           *Defendants*. | Civil Action No. 3:21-cv-00370<br><br>Hon _____ |

## PLAINTIFFS' MEMORANDUM IN SUPPORT
## OF THEIR MOTION FOR EMERGENCY INJUNCTIVE RELIEF

I. **INTRODUCTION**

      The question before this Court is whether the state on July 9 should be enjoined from enforcing recently passed Senate Bill 334—legislation that is rife with constitutional defects and is designed to be so restrictive that it will likely regulate out of existence most of the state's harm reductions programs.

      The agency authorized to promulgate rules to enforce Senate Bill 334 (or "the Syringe Services Programs Act") will not have the statutory authority to institute official regulations until the day the legislation goes into effect. This means that, if syringe service program providers plan on July 9 to continue operations, the first day that they will be able to review administrative regulations that have the force of law *is the same day on which they are first subject to significant penalties for failing to comply with those regulations*. The penalties are substantial: a

fine of up to $10,000 per violation as well as the threat of a court proceeding wherein the regulating agency will be entitled seek injunctive relief.

The issues in Senate Bill 334 arise from violations of the both the United States Constitution and the West Virginia Constitution. The result is legislation so unclear that "[t]here is no way for an 'ordinary person' to 'understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

As discussed in greater detail below, Plaintiffs are likely to prevail on the merits of their claims that Senate Bill 334 is unconstitutional. To prevent irreparable harm to both the syringe service distribution providers and the people who they serve, Plaintiffs seek a temporary restraining order, or, in the alternative, expedited preliminary injunctive relief to prevent ongoing, irreparable injury: halting the enforcement of Senate Bill 334, and (1) preventing OHFLAC from promulgating and enforcing rules against syringe service program providers, and (2) enjoining House Clerk and Keeper of the Rolls Steve Harrison from amending Senate Bill 334, as both pieces of legislation have been passed by both chambers of the legislature as written, and both have been signed by the governor into law.

Plaintiffs incorporate by reference all the allegations contained in their Verified Complaint.

## II. ARGUMENT

### A. Standard of Review

The governing standards for the issuance of temporary restraining order versus a preliminary injunction are the same, and "[b]oth are nearly identical forms of interlocutory injunctive relief." *See United States Dep't of Labor v. Wolf Run Mining Co., Inc.,* 452 F.3d 275,

281 n.1 (4th Cir. 2006). "Because a preliminary injunction is temporary and is entered with only a preview evaluation of the merits, without resolving them, the decision to enter a preliminary injunction involves consideration of the relative harms to the parties in maintaining a particular status between them until completion of the case." *Id.* at 280. The test for issuing a temporary restraining order or preliminary injunctive relief "looks beyond the immediate dispute to determine whether such an invocation of equity is in the public interest." *Id.*

A "balance of hardships" test provides the standard for the issuance of injunctive relief. The balance of hardship establishes that a preliminary injunction should be granted where the plaintiff is able to demonstrate that they (1) are likely to succeed on the merits, (2) are likely to suffer irreparable harm in the absence of preliminary relief, (3) have the balance of equities tipping in their favor, and (4) are proffering an injunction that is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008).

Here, all four relevant factors weigh heavily in Plaintiffs' favor: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent relief; (3) the balance of equities; and (4) the public interest. *See Winter v. Nat. Res. Dep't Cent.*, 555 U.S. 7, 20 (2008); *see also Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). *See also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). "When a preliminary injunction is sought against the government, . . . the last two factors merge." *Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 619 (D. Md. 2019).

Plaintiffs are likely to succeed on the merits because Senate Bill 334 is void for vagueness on its face and as applied to Plaintiffs in violation of the Due Process Clause of the Fourteenth Amendment the United States Constitution, in violation of the Equal Protection

3

clause of the Fourteenth Amendment of the Constitution, in violation of procedural due process rights guaranteed by the Fourteenth Amendment of the United States Constitution and in violation of numerous provisions of the West Virginia Constitution. Further, the legislation *undermines* the health and safety interests it purports to serve. Injunctive relief will prevent severe and irreparable harm to Plaintiffs' and their program participants and patients, is consistent with the balance of equities, and serves the public interest. Accordingly, this Court should grant Plaintiffs' motion.

> **B. Plaintiffs Will Likely Succeed on the Merits of Their Claim that Senate Bill 334 is Void for Vagueness in Violation of Plaintiff's Due Process Rights as Guaranteed by the Fourteenth Amendment of the United States Constitution**

A statute can be determined to be impermissibly vague in violation of a person's due process rights guaranteed under the U.S. Constitution for "either of two independent reasons." *Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health*, 317 F.3d 357, 366 (4th Cir. 2002). First, a statute may be impermissibly vague if "people of ordinary intelligence" are not provided "a reasonable opportunity to understand what conduct it prohibits." *Id.* Second, a law may be deemed impermissibly vague is "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* When the penalty associated with a statute is civil, not criminal, the statute may be deemed "void for vagueness" if the penalty is such that the effect is "so prohibitory and stigmatizing that it could be deemed "quasi-criminal." *Hoffman Estates v. Flipside*, 455 U.S. 489, 499, 102 S. Ct. 1186, 1194 (1982).

> **1. The penalties in Senate Bill 334 are so significant as to be "stigmatizing and prohibitory," and thus quasi-criminal**

The penalties for violations of the Syringe Services Programs Act are so significant as to be stigmatizing and prohibitory. Under the statute, a program that violates the Act is subject to up to a $10,000 fine *per violation*. The government may turn to the courts to seek an injunction

against the program. Additionally, the effect of a violation of injunctive relief *would be* criminal in nature. *See State ex rel. UMWA Int'l Union v. Maynard*, 176 W. Va. 131, 134, 342 S.E.2d 96, 99 (1985). "'Whether the proceedings are civil or criminal, a contempt of court is in the nature of a criminal offense . . .'" The threat of the imposition of such steep penalties is both stigmatizing and prohibitory: people and programs who offer syringe service distribution programs but do not understand what specific conduct would put them in violation of the Syringe Services Programs Act are more likely to either stop providing these necessary services, as Plaintiffs Ware, Koeppel and Lemire did. Others who see an unfilled need in their community for syringe distribution will be dissuaded from ever trying; the financial implications of one $10,000 fine for many could have years-long consequences.

      **2.**      **Senate Bill 334 is irreconcilable with House Bill 2500 because they both purportedly create new Sections 16-63-1, *et. seq.***

A quick review of Sections 16-63-1, *et. seq.,* of the West Virginia Code, the provisions that Senate Bill 334 purported to create, reveals an interplay of two laws that is near impossible to understand, much less analyze in a manner sufficient that an ordinary person could understand what conduct is prohibited under the law. While it is certainly confusing, it can be distilled to this: Section 16-63-1 through Section 16-63-3, all currently in effect, relate to the restrictions of municipal laws regarding the sale, use, or disposal of auxiliary containers. Section 16-63-4 through Section 16-63-10, set to go into effect on July 9 (although language in Section 16-63-10 indicates otherwise—that the law was in effect "upon passage"), relate to restrictions on syringe service programs. The first three provisions provided for in Senate Bill 334—Purported 16-63-1 through 16-63-3—contain key information, including definitions under the Act, application guidelines, and program requirements. Those three provisions were rendered void and defunct once the auxiliary container legislation went into effect on April 10. Syringe service program

5

providers—existing or new—are left with a statutory scheme that is impossible to reconcile, much less comply with.

The fact that there are two pieces of legislation that share the same article and section numbers cannot be chalked up to a mere scrivener's error. Both House Bill 2500 and Senate Bill 334 were passed by both chambers of the legislature and signed into law by the governor, and there is no indication that the legislature intended either statute to repeal or supersede the other. The creation of a new article of Chapter 16 of the West Virginia Code without going through the legislative process would require substantial inference of the legislature's intent by a Court, or an unlawful inference by the House Clerk and Keeper of the Rolls of the intent of the governor, who had the full opportunity to review both pieces of legislation prior to signing.

> **3. Conflicting and unclear language in Section 10 of Senate Bill 334 renders the statute such that it does not make it clear to an ordinary person what conduct will violate the statute**

Section 10 of Senate Bill 334," titled Coordination of Care, states as follows:

**§16-63-10. Coordination of care.**

(a) A syringe service program shall coordinate with other health care providers in its services to render care to the individuals as set forth in the program requirements.

(b) In the event that the syringe services program is closed, the syringe services program shall notify the participant of the closure of the service, prior to closure, in a conspicuous location, and provide an individual with a transition care plan.

(c) The Bureau for Medical Services shall submit a state plan amendment to permit harm reduction programs to be an eligible provider, except that the syringe exchange services shall not be eligible for reimbursement under the state plan.

(d) Upon passage, any existing provider not offering the full array of harm reduction services as set forth in this section shall cease and desist offering all needle exchange services. Any provider offering the full array of harm reduction services shall have until January 1, 2022, to come into compliance with this section. Any

6

> new provider shall have until January 1, 2022, to come into compliance with the provisions of this section.

This section, which delineates when and how syringe service programs should shut down without facing severe penalties, is so vague as to render it so that an ordinary person could not understand what conduct is prohibited. Section 16-63-10 specifically states: **Upon passage**, any existing provider not offering the full array of harm reduction services as **set forth in this section** shall **cease and desist** offering all needle exchange services. The word "section" refers to the text within the provision "10" in 16-63-10. Section 16-63-10 means Section 10 of Article 63 of Chapter 16 of the West Virginia Code.

While the section does not provide for services, it does require "coordination of care" and that a "syringe service program shall notify the participant[s] of the closure of the service," prior to ceasing services.

Section 10 further provides that any existing provider must come into compliance with Section 10 "upon passage." The term "upon passage" refers to the moment after both houses of the legislature voted to pass legislation. An ordinary person who provides syringe service distribution would reasonably think that if they were not in compliance as of the moment of passage on April 10, that they must cease and desist providing services. In fact, Plaintiffs Koeppel, Lemire, and Ware have. The section does not provide guidance sufficient that an "ordinary [person] can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." It should be declared void for vagueness in violation of the due process rights of Plaintiffs and of syringe service program providers generally.

### 4. Senate Bill 334's discrimination against "existing providers" in favor of "new providers" is not rationally related to a legitimate public interest and therefore in violation of Plaintiffs' equal protection rights under the United States Constitution

Although "legislation is presumed to be valid and will be sustained," it must, at minimum, be "related to a legitimate state interest" in order to satisfy scrutiny under an equal protection analysis. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 3254 (1985).

Section 10 arbitrarily discriminates against "existing providers." Section 10 states "Upon passage, any **existing provider** not offering the full array of harm reduction services as set forth in this section **shall cease and desist offering all needle exchange services**. Any provider offering the full array of harm reduction services shall have until January 1, 2022, to come into compliance with this section. Any **new provider** shall have **until January 1, 2022**, to come into compliance with the provisions of this section." (emphasis added).

There is no basis in the law or in the legislative history of the Act to justify requiring an "existing provider," who may already have some, if not all, infrastructure in place, from a "new provider," who could ostensibly begin providing services for the first time on July 9 without having to comply with any other provisions of the Act. Senate Bill 334 is in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and should be declared void and unenforceable.

### 5. The substance and title of the Act are deficient such that the Act violates Section 30, Article VI of the West Virginia Constitution

Federal courts may consider West Virginia constitutional questions when an application of the constitutional provision has previously been settled by the West Virginia Supreme Court of Appeals. *See e.g., Davis v. Milton Police Dep't*, No. 3:20-0036, 2020 U.S. Dist. LEXIS 82572,

at *19-20 (S.D. W. Va. May 11, 2020) (discussing circumstances in which federal courts have examined West Virginia constitutional questions). The West Virginia Constitution, Article VI, Section 30, provides that: "No act hereafter passed, shall embrace more than one object, and that shall be expressed in the title."

      **a.     The title of the Act does not provide a "pointer"
to one of the most significant provisions of the statute:
the "local approval requirement"**

The requirement that the object of an act "shall be expressed in the title" is "designed to give notice by of the title of the contents of the act so that legislators and other interested parties may be informed of its purpose." *State ex rel. Walton v. Casey*, 179 W. Va. 485, 488, 370 S.E.2d 141, 144 (1988).

The West Virginia Supreme Court of Appeals has noted that "the requirement of expressiveness contemplated by our Constitution necessarily implies explicitness." *Id.* To satisfy the expressiveness requirement of the West Virginia Constitution, a "title must, at a minimum, furnish a 'pointer' to the challenged provision in the act." *Id.*

The test to be applied to determine whether or not a title is sufficient to meet constitutional muster is "whether the title imparts enough information to one interested in the subject matter to provoke a reading of the act." *Id.* (citing *City of Huntington v. Chesapeake & Potomac Tel. Co.,* 154 W. Va. 634, 177 S.E.2d 591 (1970); *General Elec. Co. v. A. Dandy Appliance Co., supra; State ex rel. Dyer v. Sims,* 134 W. Va. 278, 58 S.E.2d 766 (1950), *rev'd on other grounds,* 341 U.S. 22, 95 L. Ed. 713, 71 S. Ct. 557 (1951); *City of Wheeling ex rel. Carter v. American Cas. Co.,* 131 W. Va. 584, 48 S.E.2d 404 (1948); *Elliott v. Hudson,* 117 W. Va. 345, 349, 185 S.E. 465, 466 (1936)).

9

The title of Senate Bill 334, while encompassing numerous provisions to be included in new article 16-63-1, *et. seq.*, such as the existence of civil penalties and a process for administrative and judicial appeal, fails to provide for perhaps the most impactful element of the legislation: a requirement that applicants who seek a license to operate a syringe services program must obtain a "written statement of support from a majority of the members of the county commission and a majority of the members of a governing body of a municipality in which it is located or is proposing to locate." Section 16-63-2(9). There is no pointer to the "local approval" requirement in the title, although this is a substantial barrier any person interested in applying for a license to operate a harm reduction program would have to meet.

This case shares parallels with *C.C. "Spike" Copley Garage v. Public Service Commission*. In *Copley*, the West Virginia Supreme Court of Appeals affirmed a circuit opinion declaring a statute unconstitutional because the title did not give sufficient notice to a provision of the act deregulating the business of "towing, hauling, or carrying wrecked or disabled vehicles." *C.C. "Spike" Copley Garage v. Pub. Serv. Comm'n*, 171 W. Va. 489, 489, 300 S.E.2d 485, 485 (1983).

The title of the legislation, the Court noted, was "enormously specific; it set forth a brief description of every major change that the act made *except* the deregulation of wreck services." *Id.* at 491. The Court noted that, because of the omission, "[a] person reading a title to a bill drawn with the specificity of the title to [the legislation] would reasonably conclude that the act did not touch that subject because all other concerns are set forth with specificity." *Id.* The government appellants in *Copley* argued that the Court should excuse a deficiency in the title because "parliamentary maneuvers" that led to the passage of the bill on the last day of session and that to "strike [the] act for a technical defect would be to exhalt form over substance . . ." *Id.*

10

at 493.. The Court disagreed, stating, "[w]hile the appellants make a persuasive argument based upon the mechanics of the legislative process . . .[the one object rule] is a constitutional provision and is there for a purpose." *Id.* Ultimately, the Court held that the act was unconstitutional because the legislature's failure to set forth a title sufficient to comply with the West Virginia Constitution, stating:

> "Whenever a procedural formality is enforced the objection can be raised that form is being exhalted [sic] over content. Yet the purpose of procedure is to enhance the rationality of the deliberative process, and a requirement that the title to a bill give fair notice is calculated to enhance rationality."

*Id.* at 493.

Furthermore, the Court stated, "after the passage of a bill by both houses, the bill must survive veto by the Governor, and the Governor is also entitled to fair notice in the title of a bill's provisions."

The West Virginia legislature similarly failed to comply with the one-object rule when it passed Senate Bill 334. The title of the Act omits a key provision that was passed in the final hours of the legislative session that requires syringe service distribution programs to obtain a "written statement of support from a majority of the members of the county commission and a majority of the members of a governing body of a municipality in which it is located or is proposing to locate." The "local approval" requirement was a last-minute addition to Senate Bill 334 passed in the final days of session. The provision was curiously slotted into a section in the Act that lists the requirements for "[a]pplication for license to offer a syringe services program." *See* Senate Bill 334's Purported Section 16-63-2(9).

The requirement for a statement of approval from local governing bodies is not akin to an "application fee" or "contact information for . . . the administrator of the harm reduction

11

program," or a requirement that an application be on "a form approved or provided by the office director." Rather, the "local approval" requirement grants veto power over even the *possibility* of existence of a syringe service program to local governing bodies. It is not simply a requirement of a program's "Application for license to offer a syringe service program"; it is a prerequisite that, if not fulfilled, would preclude any program from even applying. Notably, the title provides a pointer to the other preconditions required for a program to submit an application in "program requirements." A person reading the title of Senate Bill 334 would not reasonably be expected to believe that anything other than meeting the requirements for program services and filling out the appropriate application materials would be sufficient to apply for an obtain a license to operate a syringe service program.

      A parallel hypothetical is this: take, for example, West Virginia legislation relating to assisted living homes. *See* Section 16-5D-1, *et seq.* In 2003, legislators introduced Senate Bill 405, "relating to the changing of personal care homes and residential board and care homes to assisted living residences." The title of the legislation is as follows:

> AN ACT to repeal article five-h, chapter sixteen of the code of West Virginia, one thousand nine hundred thirty-one, as amended; and to amend and reenact articles five-d and five-t of said chapter, all relating to the changing of personal care homes and residential board and care homes to assisted living residences; defining assisted living; defining limited and intermittent nursing care; establishing limitations and exceptions to definitions; clarifying licensure requirements; specifying duties of licensees; providing for residents to contract for additional services; clarifying responsibilities of property owners; providing for emergency rules; extending the care home advisory board for an additional six months; and making technical changes throughout.

2003 W.V. ALS 113, 2003 W. Va. Acts 113, 2003 W.V. Ch. 113, 2003 W.V. SB 405.

Senate Bill 405, now codified 16-5D-1, et. seq., is extensive, and a quick review of the title would give a reader pointers to the key pieces of the legislation: for example, the title includes how assisted living homes are defined, clarifications of licensure requirements, and the responsibilities for property owners. *Id.* A person seeking to operate an assisted living home would understand from a review of the title the substance of the act. However, if the legislation required people seeking to operate assisted living homes to obtain a written statement of approval from the local city council and county commission within the licensure requirements in the text, a provision that would give local government "veto" power over the existence of a prospective facility, the title would be insufficient to comply with the West Virginia Constitution, because, although the title is written with some explicitness, it would not have provided a "pointer" to a key provision. The title, like the title of Senate Bill 334 would necessarily fail the expressiveness requirement of the West Virginia Constitution.

    **b.**  **By encompassing sections of the code that are related to "auxiliary containers" in addition to "syringe service programs," the act unconstitutionally embraces two objects**

The "one object rule" is not merely directory; such an assertion would "seem[] to conflict with the fundamental principle of constitutional construction that whatever is prohibited by the constitution, if in fact, done, is ineffectual." *Simms v. Sawyers*, 85 W. Va. 245, 253, 101 S.E. 467, 470 (1919).

If a title includes both subjects of legislation embraced in the act, "the whole act must fall for the very sufficient reason that it is improper for the Court to choose between the two." *Id.* at 255, 472.

The title of Senate Bill 334, which designated a new article, Sixty-Three, in Chapter Sixteen of the West Virginia Code, references specifically the chapter, article, and section of

13

each provision to be codified. *See* History of Senate Bill 334, attached as Exhibit A to the Complaint. The sections are designated in the title of Senate Bill 334 as Section 16-63-1 through 16-63-10. Senate Bill 334 is scheduled to go into effect on July 9. *Id.*

House Bill 2500, which also designated a new article, Sixty-Three, in Chapter Sixteen of the West Virginia Code, went into effect upon passage on April 10. *See* History of House Bill 2500, attached as Exhibit B to the Complaint. The sections created in House Bill 2500 include Section 16-63-1 through 16-63-3. *Id.* Because House Bill 2500 went into upon passage on April 10, 2021, Sections 16-63-1 through 16-63-3 are currently in effect, while Senate Bill 334's 16-63-1 through 16-63-3 will not go into effect until July 9.

As a result, the title of Senate Bill 334 expresses more than one object in the title: sections 16-63-1 through 16-63-3 expresses legislation that went into effect upon passage on April 10 that concerns regulations of the use, dispositions, and sale of auxiliary containers. *Id.* Sections 16-64-4 through 16-63-10, meanwhile, express legislation passed on April 10 but not in effect until July 9 pertaining to the "license application process for needle-exchange programs." *Id.* The title, and therefore the Act, expresses more than one object.

> **6.** **A use of authority granted to the House Clerk and Keeper of the Rolls in House Rule 20 to revise the statute or create a new section of Article 16 goes beyond a correction of "errors or omissions" and is an unconstitutional violation of the requirements for amendments to legislation prescribed in the West Virginia Constitution**

While newly-amended House Rule 20 authorizes the Clerk of the House of Delegates and Keeper of the Rolls "to correct errors and omissions prior to the final printing of legislative

14

documents or publications,"[1] such authority cannot reach beyond the signing of the bills by the governor without violating the separation of powers doctrine of the West Virginia Constitution.

It is possible that the Clerk of the House of Delegates and Keeper of the Rolls may use this authority to unilaterally amend Chapter 16 of the West Virginia Code to provide for a new article for either the Syringe Services Act or the Act relating to auxiliary containers. It is possible that he has already done so. Such action would not only extend well beyond the correction of "errors and omissions," but it would unlawfully invade the province of the executive branch by amending a chapter of the state code after the legislation has been passed by both houses and, upon review, signed into law by the governor. The use of authority granted under House Rule 20, as applied, is in violation of Article Six, Section 31 of the West Virginia Constitution, which requires that amendments to a bill shall be voted on by both chambers of the legislature, requiring an affirmative vote of a majority of all members of each house.

### C. Plaintiff Will Suffer Irreparable Harm if the Court Declines to Issue This Injunction

Once the Syringe Services Program Act goes into effect, the lack of clarity within the bill ensures that Plaintiffs who have stopped services will have to cease completely or face the threat of significant fines or injunctive relief. In fact, the Plaintiffs who have stopped services have already suffered harm due to the lack of clarity in the bill, including confusion as to what exactly was the effective date. *See* Declaration of Carrie Ware and Joint Declaration of Lawson Koeppel and Alina Lemire, both submitted with Complaint.

Although Plaintiff Milan Puskar Health Right expects to be able to continue to offer some level of syringe service distribution, the vagueness of the bill and the lack of guidance to

---

[1] House Rule 20 provides in full: "The Clerk shall have supervision and charge of all printing done for the House and the printer shall print only such documents and other matter as the Clerk authorizes. The Clerk is authorized to correct errors and omissions prior to the final printing of legislative documents or publications." W. Va. HR 1.

15

providers may result in Plaintiff restricting services further than required under the law because of fear of significant fines and injunctive relief.

The enforcement of the restrictions provided for in Senate Bill 334 will also result in Plaintiff Milan Puskar Health Right having "fewer opportunities to prevent the spread of diseases including HIV, endocarditis, and Hepatitis C," due to both restricted access to sterile syringes and by not having opportunities to refer patients who will no longer come to the program for testing and care. *See* Declaration of Laura Jones, submitted with Complaint.

If Senate Bill 334 is enforced, Plaintiff Milan Puskar Health Right also risks decreases in funding from government and private funders, in part because many funders and the federal government (which provides funding for support services but not the purchase of sterile syringes) are more supportive of programs that follow CDC best practices. *Id.*

And, of course, the harm to people who use drugs and who rely on these providers for sterile syringes will be irreparable. Without access to sterile syringes, people who inject drugs will use the same syringe over and over again, which will likely result in infection and potentially the transmission of an infectious disease like Hepatitis C or HIV.

### D. Defendants Will Not Be Irreparably Harmed if They Are Enjoined From Enforcing Senate Bill 334 or Amending the Syringe Services Programs Act

Emergency injunctive relief enjoining Defendants from enforcing Senate Bill 334 will simply leave the state of the law restricting syringe distribution as it is: left to municipalities and counties that already do or do not have ordinances in place. Enjoining Defendant Harrison from creating a new article to the Code or otherwise amending Senate Bill 334 will simply preserve the legislation as it stands today, and as it stood when it was passed by both chambers of the legislature and signed into law by the governor.

### E. Granting Emergency Injunctive Relief Will Serve the Public Interest

It is in the public interest to ensure that the government does not unfairly, arbitrarily, or enforce unconstitutionally vague statutes and regulations against syringe services programs. Further it should not be permitted to promulgate and enforce those rules, or to amend legislation in a scope beyond its constitutionally delegated power, against Plaintiffs. Issuing a temporary restraining order and enjoining Defendants from enforcing Senate Bill 334 in accordance with the constitutional standards discussed above will promote that result.

What *is* in the public interest is allowing syringe service programs to continue operating as the law now stands, and with little confusion as to what may or may not apply to them. Syringe service distribution programs are a key tool to stemming the spread of infectious diseases, and West Virginia—particularly Huntington and Charleston—are at the epicenter of these outbreaks.

### F. A Bond is Not Necessary in this Case

This Court has discretion to and should waive FRCP 65(c)'s bond requirement. *See e.g., Pashby v. Delia*, 709 F.3d 307, 331-32 (4th Cir. 2013). The preliminary injunction will result in no monetary loss for Defendants.

## III. CONCLUSION

For these reasons, this Court should grant Plaintiffs' motion and enter an Order prohibiting enforcement of Senate Bill 334.

**Respectfully submitted,**

**by Counsel,**

/s/ Loree Stark
Loree Stark
West Virginia Bar No. 12936
ACLU of West Virginia Foundation
P.O. Box 3952
Charleston, WV 25339-3952
(914) 393-4614
lstark@acluwv.org