IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

MILAN PUSKAR HEALTH RIGHT,
LAWSON KOEPPEL, ALINA LEMIRE,
and CARRIE WARE,
                            *Plaintiffs*,

v.

BILL J. CROUCH, *et. al*,
                            *Defendants*.

Civil Action No. 3:21-cv-00370

Hon. Robert C. Chambers, District Judge

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR EMERGENCY INJUNCTIVE RELIEF**

Defendants' dismissal of Plaintiffs' legitimate constitutional claims as the product of

"unhappiness" with the legislature is an attempt to minimize to the point of obscurity the threat

that enforcement of Senate Bill 334, if it takes effect on Friday, poses to Plaintiffs and others like

them.

Simply put, Plaintiffs are entitled, under the United States Constitution, to notice about

what conduct will trigger the stigmatizing and prohibitory penalties embraced in Senate Bill 334.

(*See e.g.*, *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Papachristou* v. *Jacksonville*,

405 U. S. 156 (1972) for the proposition that the Due Process Clause of the Fourteenth

Amendment guarantees that "ordinary people" have "fair notice" of the conduct a statute

proscribes). Plaintiffs are also entitled to equal protection under the law. Despite what

Defendants may suggest in their brief,[1] a person's constitutional rights are not undermined

simply because they may "disagree with the Legislature's policy choices."

---

[1] *See* Defs' Br. 1. Dkt. 14.

Before the Court is legislation that is rife with constitutional deficiencies. Defendants ask the Court to adopt its shifting explanations and interpretations of vague and conflicting language in Senate Bill 334 to arrive at a result rendering the construction of this statute constitutionally credible. This requires this Court to not only ignore the plain language of the Syringe Services Program Act, but to rewrite it.

The Defendants also urge the Court to accept as fact that actions taken by the Clerk of the House of Delegates and Keeper of the Rolls in sending a "code conflict report" to entities including LexisNexis and the Legislative Services Division are tantamount to the legislature itself creating a new article in Chapter 16 of the West Virginia Code. Accepting this proposition also means that those actions taken by the Clerk of the House of Delegates and Keeper of the Rolls have the weight of the governor signing into law the new article that the legislature would have created.

Plaintiffs request, on the same grounds as laid out in their Complaint for Declaratory and Emergency Injunctive Relief and in the corresponding Motion for Emergency Relief, that the Court extend the relief granted in the Temporary Restraining Order it granted on June 28, 2021, Dkt. 13, to enjoin Defendants from enforcing Senate Bill 334.

**ARGUMENT**

Plaintiffs believe that their briefing of three of the four *Winter* factors—regarding the likelihood of irreparable harm, a consideration of the balance of the equities, and that an injunction would be in the public interest—in their Memorandum in Support of Motion for Emergency Injunctive Relief, Dkt. 5, is sufficient to demonstrate that those factors have been established in Plaintiffs' favor. Therefore, Plaintiffs will focus primarily on addressing Defendants' arguments regarding the remaining factor: "likelihood of success on the merits,"

with regard to their federal constitutional claims. Plaintiffs believe that their prior briefing on the state constitutional law claims is sufficient to demonstrate likelihood of success on the merits and that those claims are properly before this Court.[2]

As a preliminary matter, Plaintiffs must address Defendants' contention that any relief enforced against Defendant Clerk of the House of Delegates and Keeper of the Rolls would be barred by the Eleventh Amendment. *See* Defs.' Br. at 6. Dkt. 14. This is untrue and is an overly simplistic reading of *Ex Parte Young* and its progeny. Plaintiffs' due process and equal protection claims are rooted firmly in the United States Constitution, and therefore relief against Defendant Harrison is permissible. *See, Donald J. Trump for President, Inc. v. Bullock*, 491 F. Supp. 3d 814, 826 (D. Mont. 2020) ("Predictably, the parties disagree on *Pennhurst*'s application to the present suit. Defendants contend that although Plaintiffs' complain of violations of the federal constitution, the interpretation of state law necessary to resolve the merits of those complaints renders the claims barred by the Eleventh Amendment. In other words, Defendants contend that the Plaintiffs have brought claims based solely on state law under the guise of a federal constitutional claim. Plaintiffs respond that while their federal claims certainly require this Court's interpretation of state law, their claims are firmly rooted in the United States Constitution and are thus constitutionally permissible under the Eleventh Amendment. The Court finds Plaintiffs' position persuasive."). Additionally, the relief requested here against Defendant Harrison[3] is not akin to the relief requested in *Bragg* or *Pennhurst*. Plaintiffs are not requesting

---

[2] If the Court disagrees with regards to the separate state constitutional claims, Plaintiffs respectfully request that the Court use their discretion to certify these questions to the state supreme court. *See, e.g.*, *Harper v. Hewitt*, No. 3:06-0919, 2009 U.S. Dist. LEXIS 89705 (S.D. W. Va. Sep. 29, 2009).

[3] Plaintiffs intend to file a Motion for Leave to File an Amended Complaint shortly after this filing in order to add the Director of Legislative Services. In Defendants' Response, Defendant Harrison asserts that he relayed the "code conflict check" to the Director of Legislative Services, and that, absent this action, Sections 16-64-1, *et. seq.*, would be added to the West Virginia Legislature's site, the main point of public access to the unofficial West Virginia

that Defendant Harrison carry out extensive duties to supervise compliance of an extensive

statutory scheme, as in *Pennhurst*, nor are they requesting he do anything near extensive as

"make particular findings" as part of duties required under a state law statute. *See*, *e.g*., *Bragg v.*

*W. Va. Coal Ass'n*, 248 F.3d 275, 296 (4th Cir. 2001). Plaintiffs are merely requesting this Court

enjoin Defendant Harrison from moving forward and taking any action that would result in any

additional violation of Plaintiffs' federally protected due process rights. *See e.g., Paul v. Davis*,

424 U.S. 693, 710-11 (1976) ("[I]t is apparent from our decisions that there exists a variety of

interests which are difficult of definition but are nevertheless comprehended within the meaning

of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this

constitutional status by virtue of the fact that they have been initially recognized and protected

by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth

Amendment apply whenever the State seeks to remove or significantly alter that protected

status.").

A.    **Senate Bill 334 is Void for Vagueness in Violation of Plaintiffs' Due Process Rights**
      **as Guaranteed by the Fourteenth Amendment of the U.S. Constitution**

Legislation can be determined to be impermissibly vague in violation of a person's due

process rights guaranteed under the U.S. Constitution for "either of two independent reasons."

*Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health*, 317 F.3d 357, 366 (4th Cir. 2002).

First, a statute may be impermissibly vague if "people of ordinary intelligence" are not provided

"a reasonable opportunity to understand what conduct it prohibits." *Id.* Second, a law may be

deemed impermissibly vague is "if it authorizes or even encourages arbitrary and discriminatory

enforcement." *Id.* When the penalty associated with a statute is civil, not criminal, the statute

---

Code. Any arguments made by Plaintiff with regards to requesting that Defendant Harrison be enjoined should, if
the Plaintiffs' Motion for Leave is granted, be read to apply to the Director of Legislative Services as well.

may be deemed "void for vagueness" if the penalty is such that the effect is "so prohibitory and stigmatizing that it could be deemed "quasi-criminal." *Hoffman Estates v. Flipside*, 455 U.S. 489, 499, 102 S. Ct. 1186, 1194 (1982). Senate Bill 334 does not provide an ordinary person a reasonably opportunity to understand what conduct it prohibits, and it authorizes and encourages arbitrary and discriminatory enforcement. Its significant penalties are so substantial that they should be deemed quasi-criminal.

> 1.    **The penalties contained in Senate Bill 334 are so stigmatizing and prohibitory that they are quasi-criminal.**

When the penalty associated with a statute is civil, not criminal, the statute may be deemed "void for vagueness" if the penalty is such that the effect is "so prohibitory and stigmatizing that it could be deemed "quasi-criminal." *Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982).

Defendants cite to a Fifth Circuit case, *Ford Motor Company v. Texas Department of Transportation*, to argue that the significant penalties imposed by Senate Bill 334 do not rise to the level of quasi-criminal, and therefore do not require a more exacting requirement of precision or certainty. *See* Defs.' Br. 8. Dkt. 14. However, the *Ford* case involved a civil penalty recommended by an administrative law judge, not a statutory scheme that contemplates fines of up to $10,000, injunctive relief, and license revocation for violations under the law as Senate Bill 334 does.

In fact, as the *Ford* Court notes, it is precisely the type of penalties that are outlined in Senate Bill 334 that *are* considered quasi-criminal and therefore trigger heightened review:

> In *United States v. Clinical Leasing Service, Inc.*, 925 F.2d 120, 122 (5th Cir. 1991), this Court reviewed a federal statute prescribing civil penalties for "any party who distributes or authorizes the distribution of controlled substances without adequate registration." Although the statute authorized civil

> penalties, this Court determined that "its prohibitory effect is quasi-criminal and warrants a relatively strict test." *Id.* As such, the statute was required to define the offense "'with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* (citing *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 1858, 75 L. Ed. 2d 903 (1983)). Similarly, this Court found that **where a statute permits "potentially significant civil and administrative penalties, including fines and license revocation," quasi-criminal treatment is appropriate and thus the more strict standard of review applies**. *Women's Medical Center of Northwest Houston v. Bell*, 248 F.3d 411, 2001 WL 370053 (5th Cir. 2001). In the present case, the Code only provides for civil monetary damages in the event of a violation.

*Ford Motor Co. v. Tex. DOT*, 264 F.3d 493, 508 (5th Cir. 2001) (emphasis added).

This reasoning has been followed by at least one district court in the Fourth Circuit. In *Stuart v. Huff*, the District Court for the Middle Circuit of North Carolina stated that "[Q]uasi-criminal penalties are those sanctions which impose 'significant civil and administrative penalties, including fines and license revocation.'" *Stuart v. Huff*, 834 F. Supp. 2d 424, 434 (M.D.N.C. 2011). Although the Court in *Stuart* did not find the ambiguities in that case sufficient to void the Act, the penalties were significant enough that Plaintiffs were "entitled to a statute that sets forth their obligations clearly." *Id.*

The Syringe Services Programs Act's penalties are so significant as to be considered "quasi-criminal," and Plaintiffs are "entitled to a statute that sets forth their obligations clearly."

**2.     The House Clerk's initial steps to "redesignate" Senate Bill 334 do not have the effect of a law printed in an official reporter, and, regardless, cannot be presumed to be effective over the enrolled bill.**

Defendants do not dispute that both House Bill 2500 and Senate Bill 334, as drafted, as passed by the legislature, and as signed into law by the governor, create a new article—sixty-three—of Chapter Sixteen of the West Virginia Code. Defendants also do not dispute that

Sections 16-63-1 through 16-63-3 of the West Virginia Code pertain to auxiliary containers and have the force and effect of law.

However, Defendants now refer to the Syringe Services Programs Act as **16-64-1**, *et. seq.*, based on a "redesignation" process undertaken by the Defendant Harrison, the House Clerk and Keeper of the Rolls, pursuant to "legislative code designation practices." *See* Defs.' Br. 4-6. Dkt. 14.

To the extent that Defendants argue that the Syringe Services Programs Act could be properly codified as 16-64-1, *et. seq.* and held out on Friday, July 9 to the public as such, relies entirely on this: the Office of the Clerk has, prior to this suit, sent a "code conflict report" internally to the Office of Legislative Services, which maintains the unofficial online code, and externally to legal reporters LexisNexis and Thomson Reuters. *Id* at 6. The "redesignation" of the Syringe Services Programs Act will likely not be sent to the *official* reporter, the Acts of the Legislature, until the fall of this year. *See* Affidavit of Steve Harrison, Ex. 1 to Defs.' Br. Dkt. 14-1.

However, even if Senate Bill 334 was sent to the official reporter and published as 16-64-1, *et. seq.*, it is the text of the enrolled bill that controls. *See* Syl. Pt. 1, *Charleston Nat'l Bank v. Fox*, 119 W. Va. 438, 440, 194 S.E. 4, 5 (1937) ("The printed acts of the Legislature are presumed to be valid enactments. Where, however, there is a variance between a printed act and the enrolled bill, the enrolled bill controls.").[4]

---

[4] Although Defendants argue that it is common practice for "placeholder designations" to remain in place *after* the governor has signed a bill into law or the bill becomes law because the governor failed to veto it, it is worth noting that, to the extent this is the case, this practice appears to be only known and recognized by offices within the legislature. For example, OHFLAC itself has externally referred to this legislation in communications with stakeholders as Sections 16-63-1, *et. seq.*, and relied on that article (or those articles) and section numbers in drafting prospective policies that might apply.  *See* Affidavit of Jolynn Marra, attached as Exhibit 2 to Defs.' Response Brief, Dkt. 14. The purported existence of this quiet practice also has serious implications for municipalities that rely on the state code when crafting their own ordinances. For example, on April 19, 2021, four days after the governor signed Senate Bill 334, into law the Charleston, West Virginia city council passed their own

The mailing or emailing of a "code conflict report" to an internal office or an external legal reporter does not give the result of that report the force and effect of law. When the Syringe Services Programs Act is made effective this Friday, it can only be effective to the extent that it reflects the content of Senate Bill 334: as Sections 16-63-1, *et. seq.*

> **3.     There is no clear intent on behalf of the legislature for Senate Bill 334 or House Bill 2500 to supersede or override the other, and therefore a "latest expression of legislative will" analysis is not required here; however, even if the Court did invoke that analysis, House Bill 2500 would still prevail.**

Defendants further argue that in the event the Court determines that, as demonstrated above, Senate Bill 334 and House Bill 2500 contain identical article numbers in the code, Senate Bill 334 should take precedence. Defs.' Br. 7. Dkt. 14. Such a ruling would require this court to strike down existing law, 16-63-1 through 16-63-3, without any request before it to do so.

However, it is inappropriate for the Court to consider whether the passage of either Senate Bill 334 or House Bill 2500 resulted in a "repeal by implication" of the other. Defendants invoke *Wiley v. Toppings* to suggest that the statute passed last would take precedence. Defs.' Br. 7. Dkt. 14. However, repeals by implication are "not favored in law," and may only be considered when the implication of repeal is "clear, necessary, irresistible, and free from reasonable doubt." *Russell v. Town of Granville*, 237 W. Va. 9, 12, 784 S.E.2d 336, 339 (W. Va. 2016) (citing *State ex rel. City of Wheeling v. Renick*, 145 W.Va. 640, 116 S.E.2d 763 (W. Va. 1960); *State ex rel. Thompson v. Morton*, 140 W.Va. 207, 212, 84 S.E.2d 791, 795 (W. Va. 1954)).

Here, there is no evidence that the legislature intended either piece of legislation to repeal

---

harm reduction ordinance, which requires that a program have "a syringe services program license from the West Virginia Office for Health Facility Licensure and Certification, pursuant to W. Va. Code ch. 16, **art. 63** . . ." *Charleston, West Virginia Code of Ordinances Sec. 78-381* (emphasis added.)

or supersede the other. Moreover, as Defendants note, *Wiley v. Toppings* is rooted in the principle that "effect should always be given to the latest . . . expression of the legislative will." Defs. Br. 7; *Wiley v. Toppings*, 556 S.E.2d 818, 820 (W. Va. 2001). The *Wiley* court's reasoning stems from a previous West Virginia Supreme Court of Appeals case, where the Court, in examining two pieces of legislation pertaining to the same subject matter, found that the later-passed piece of legislation impliedly repealed the former, noting "the effect should always be given to the latest rather than the earliest expression of the legislative will, presumption being that the latter part of the statute was last considered." *See Speidel v. Warder*, 56 W. Va. 602, 608, 49 S.E. 534, 536 (W. Va. 1904).

Even if this Court engaged in an analysis to determine the intent of the legislature by examining the "latest . . . expression of legislative will," it would find that House Bill 2500 prevails.  The final action by the legislature with regards to Senate Bill 334 and House Bill 2500 during legislative session was a vote on the evening of the last day of session: The House of Delegates, at approximately 10:22 p.m., voted to make House Bill 2500, creating Sections 16-63-1 through 16-63-3, effective upon passage. *See* History of Senate Bill 334, Dkt 1-4. It is beyond fathomable that the legislature would return to a piece of legislation, solely to adjust its date to make it effective *immediately upon passage*, if it had intended legislation it passed less than half an hour prior to that to repeal it.

On Friday, if the Syringe Services Programs Act goes into effect, only sections 16-63-4 through 16-63-10 will have legal force because Sections 16-63-1 through 16-63-3 are currently law and relate to "establishing statewide uniformity for auxiliary container regulations." Without the key provisions of 16-63-1 through 16-63-3 intact, Senate Bill 334 must fail because it is

unconstitutionally void for vagueness in violation of Plaintiffs' due process rights as guaranteed

by the United States Constitution.

> **4.**      **The absence of sufficient clarity in Section 16-63-10 makes it wholly unclear what conduct violates the statute; Defendants' arguments to the contrary require this Court to rewrite the statute**

Defendants skirt the plain language of Section 16-63-10 in an attempt to render the

statute constitutionally sufficient.

Section 16-63-10(d) states as follows:

> Upon passage, any existing provider not offering the full array of harm reduction services as set forth in this section shall cease and desist offering all needle exchange services.  Any provider offering the full array of harm reduction services shall have until January 1, 2022, to come into compliance with this section. Any new provider shall have until January 1, 2022, to come into compliance with the provisions of this section.

Defendants do not dispute that this section of the code requires existing providers to act

"upon passage," which in West Virginia is determined by the moment that a statute passes both

legislative chambers. Defendants do not dispute that "this section" refers to subsection (d) of

Article Sixty-Three of Chapter Sixteen of the West Virginia Code. The section plainly

commands a provider "not offering the full array of harm reduction services in **this section**" to

"cease and desist offering all needle exchange services." (Emphasis added.) Defendants do not

appear to dispute that there is no list of services contained in this section, although it does

provide requirements for "coordination of care" and notification of closure of services. While

there are a number of services referenced in an entirely different section of the legislation,

Section 16-63-3, Section 16-63-10(d) uses the term "this section"—i.e., subsection (d)—no

fewer than three times in prescribing conditions for compliance. For this Court to determine that

this section of the legislation is not constitutionally vague, requires the Court to essentially rewrite the statute to comport with Defendants' suggested meaning.

Further, when Defendants later argue that this section does not favor new providers in violation of the Fourteenth Amendment's equal protection clause, they present an *entirely different reading* that only supports Plaintiffs' arguments that this section is so vague it should be rendered void. *See* Defs.' Br. 10-12. Dkt. 14. Defendants argue that both new and existing providers, despite clear language in 16-63-10(d) to the contrary, are subject to the same standards of compliance, and that, despite *any* language stating otherwise, compliance must refer to requirements under various provisions of the Syringe Services Programs Act other than "full array of harm reduction services." While this interpretation is not borne from any plain reading of the statute, the suggestion that it is a reasonable one only further underscores just how unclear the statute is.

Finally, this is all further compounded by the issue that the term "provider," prior to its use in 16-63-10(d), is only used in the Syringe Services Programs Act to refer to "health care providers," which is itself an undefined term but is neither a harm reduction program or a syringe-service program. Despite Defendants' arguments to the contrary, the section should be declared void for vagueness in violation of the due process rights of Plaintiffs and syringe service program providers generally.

**5**.    **Defendants' argument regarding "actual notice" does not apply to a draft rule, unavailable to the public, submitted to relatively few stakeholders, that is subject to change until the moment Senate Bill 334 goes into effect.**

Defendants argue that because one Plaintiff was contacted in the initial drafting of an emergency rule, that this would put them on actual notice of what conduct would be prohibited. Defendants rely on the Fourth Circuit's decision in *United States v. You-Tsai Hsu*, 364 F.3d 192,

197 (4th Cir. 2004), to make their point. However, in *You-Tsai Hsu*, actual notice was predicated on a statute that had been lawfully enacted, in its final form, and available to the public. *Id.* In this case, Defendants rely on a draft rule that is not in its final form and has not been filed with the Secretary of State (nor would it have been prior to July 9 even absent this action). Further, stakeholders that were contacted were informed that comments would be accepted for feedback and incorporation up **until the eve of Senate Bill 334's effective date**. *See* Declaration of Laura Jones, submitted here with Plaintiffs' Reply. This is not fair notice. Finally, Defendants do not suggest that any other plaintiffs in this action were given notice.

**B.      Senate Bill 334 Violates Plaintiffs' Equal Protection Rights Because it Discriminates Against Existing Providers in Favor of New Providers.**

As noted above, Defendants argue that Plaintiffs' reading of Section 16-63-10(d)'s plain language is incorrect. Again, Section 16-63-10(d) states:

> Upon passage, any existing provider not offering the full array of harm reduction services as set forth in this section shall cease and desist offering all needle exchange services.  Any provider offering the full array of harm reduction services shall have until January 1, 2022, to come into compliance with this section. Any new provider shall have until January 1, 2022, to come into compliance with the provisions of this section.

Defendants argue that it is somehow clear that new syringe service programs must already have a license to provide syringe services under the statute, and that new providers are not granted any benefit over existing syringe service programs. If that is the case, however, it is entirely unclear what other provisions of the Syringe Services Programs Act a new syringe services program would have until January 1, 2022 to meet, given that all of the other requirements under the statute to which Defendants refer must be met to get the license in the

12

first place. The plain language of the statute favors new providers over existing providers, and the discrimination against existing providers has no rational basis (nor have Defendants suggested one) to any legitimate government purpose.

## III.   CONCLUSION

Plaintiffs have demonstrated that they will prevail on the four *Winter* factors. For these reasons, Plaintiffs' request this Court extend the relief granted in its Temporary Restraining Order on June 28, 2021, and enter a preliminary injunction order reflecting the same.

**Respectfully submitted,**

**by Counsel,**

/s/ Loree Stark _____
Loree Stark
West Virginia Bar No. 12936
ACLU of West Virginia Foundation
P.O. Box 3952
Charleston, WV 25339-3952
(914) 393-4614
lstark@acluwv.org