IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

MILAN PUSKAR HEALTH RIGHT,
LAWSON KOEPPEL,
ALINA LEMIRE, and
CARRIE WARE,

                Plaintiffs,

v.                                                      CIVIL ACTION NO. 3:21-0370

BILL J. CROUCH, in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources,
JOLYNN MARRA, in her official capacity as
Interim Inspector General and Director of the
Office of Health Facility Licensure and Certification,
STEVE HARRISON, in his official capacity as Clerk
of the House of Delegates and Keeper of the Rolls, and
RICH OLSEN, in his official capacity as Director of
the Division of Legislative Services,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

On June 28, 2021, the Court granted Plaintiffs' Motion for Emergency Injunctive Relief and issued a temporary restraining order (ECF No. 11). After holding a preliminary injunction hearing, the Court extended that injunctive relief pending further action. Now, the question before the Court is whether it should further extend that order and issue a preliminary injunction. For the following reasons, the Court **DISSOLVES** the June 28, 2021, Temporary Restraining Order and **DENIES** Plaintiffs' request for a preliminary injunction.

Also pending before the Court is Defendants' Motion to Supplement the Record (ECF No. 26). For reasons appearing to the Court, that motion is **GRANTED.**

**I. BACKGROUND**

West Virginia is experiencing an opioid-related epidemic and facing alarming outbreaks of Hepatitis C and HIV, all exacerbated by the spread of infections and other harm related to the use of syringes by drug abusers and others untrained in syringe hygiene. To combat these outbreaks, public health officials have implemented several strategies, including sterile syringe exchanges. These programs, which are also known as "needle exchanges," provide sterile syringes to participants upon request, while promoting other public health services and preventing the spread of disease. As the amicus brief reports, these exchanges are considered harm reduction initiatives that have already demonstrated significant success across West Virginia and are recommended by many governmental and other health care entities.

Despite this success and contrary to the recommendations and objections from authorities in the field, the West Virginia Legislature decided to regulate these syringe services, perhaps to the point of elimination. On April 10, 2021, state lawmakers passed Senate Bill 334, the Syringe Services Program Act, which establishes an oversight scheme for syringe service programs in West Virginia. These measures create a new article of Chapter Sixteen of the West Virginia Code. W. Va. Ann. Code §§ 16-63–10 et seq. (West 2021).[1] Among other things, the Bill requires syringe services programs to obtain a license from the Office of Health Facility Licensure and Certification ("OHFLAC"), to "distribute syringes with a goal of a 1:1 model," and to be part of a comprehensive harm reduction program which offers or refers participants to other services. § 16-64–3.

The Bill also authorizes OHFLAC to promulgate emergency rules to "effectuate the provisions of [Senate Bill 334] in accordance with evidence-based practices" by July 1, 2021. §

---

[1] For the sake of clarity, this Opinion adopts the article number designated by the Clerk of the West Virginia House of Delegates (W. Va. §§ 16-64–1 et seq.). Unless otherwise indicated, all citations to sections of the code refer to West's Annotated Code of West Virginia.

16-64–7. Defendants have proffered at least five drafts that were sent to interested parties, including Milan Puskar Health Right Director Laura Jones. These draft rules indicate that OHFLAC intended to file its final rule with the West Virginia Secretary of State on July 1, 2021, and for the final rule to go into effect on July 9, 2021— the same day that Senate Bill 334 was set to go into effect. *Attach. D to Marra Aff*. ECF No. 14-2. Marra testified that OHFLAC decided not to file the rule in light of the Court's TRO.

On June 25, 2021, Plaintiffs Milan Puskar Health Right, Lawson Koeppel, Alina Lemire, and Carrie Ware filed the Verified Complaint for Declaratory and Emergency Injunctive Relief for Constitutional Violations (ECF No. 1) and a Motion for Emergency Injunctive Relief (ECF No. 4). Plaintiffs claim that the law violates their due process and equal protection rights, as well as the West Virginia Constitution. As sterile syringe service providers, Plaintiffs predict that the enforcement of Senate Bill 334 will result in fewer people accessing health services and fewer opportunities to prevent the spread of diseases including HIV, endocarditis, and Hepatitis C. Plaintiffs ask for a preliminary injunction (1) enjoining the State Defendants from enforcing Senate Bill 334; (2) enjoining the Clerk of the House of Delegates and Keeper of the Rolls from exercising any authority granted to him under House Rule 20 to amend Senate Bill 334; and (3) waiving the bond requirement for Plaintiffs.

On June 28, 2021, the Court issued a temporary restraining order granting Plaintiffs' requested relief, and on July 2, 2021, Defendants submitted their response in opposition (ECF No. 14). On July 7, 2021, the Court entered another order resolving several issues ahead of the preliminary injunction hearing. Specifically, the Court held that Plaintiffs were not likely to succeed on Count I of the Amended Complaint, but only to the extent that it is premised on Senate Bill 334 being irreconcilable with House Bill 2500. The Court also held that Plaintiffs were not

likely to succeed on Count IV, which alleged violation of the expressive title requirement under the West Virginia Constitution.

The Court held a preliminary injunction hearing the next day. At the outset of the hearing, the Court reiterated its prior findings and held that Plaintiffs were also not likely to succeed on Count VI, which alleges another violation of the expressive title requirement and a violation of separation of powers under the West Virginia Constitution. The parties then presented evidence and oral argument on the remaining claims. At the close of the hearing, the Court extended the TRO pending this Order.

## II. STANDARD OF REVIEW

In deciding whether to issue a preliminary injunction, the Court recognizes that it "is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated*, 130 S. Ct. 2371 (2010), *reinstated in part*, 607 F.3d 355 (4th Cir. 2010) (citations omitted). "Granting the ultimate relief requested, even temporarily, at an early point in the case, often prior to the issues even being joined in the pleadings, seems rightly reserved for only the most compelling of cases." *Dewhurst v. Century Aluminum Co.*, 731 F. Supp. 2d 506, 514 (S.D. W. Va. 2010), *aff'd*, 649 F.3d 287 (4th Cir. 2011).

In order to obtain a preliminary injunction, a party must establish four elements: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citation omitted). When the government is the party opposing the motion for preliminary injunction, the analyses regarding potential harm to the opposing party and the public interest merge. *See Roe v.*

*Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020).

### III. ANALYSIS

#### A. <u>Likelihood of Success on the Merits</u>

Plaintiffs' six-count Amended Verified Complaint asserts that Senate Bill 334 violates (I) the Void for Vagueness Doctrine, (II) Plaintiffs' procedural due process rights, (III) the Equal Protection Clause, and (IV)-(VI) the West Virginia Constitution. For the following reasons, the Court finds that Plaintiffs are only likely to succeed on the equal protection claim.

*Count I—Void for Vagueness*

The prohibition against vague laws "is rooted in the Due Process Clause of the Fifth and Fourteenth Amendments." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019). A law is impermissibly vague if it fails to "give a person of ordinary intelligence adequate notice of what conduct is prohibited," or if it fails to "include sufficient standards to prevent arbitrary and discriminatory enforcement." *Id*. "The purpose of the fair notice requirement is to enable citizens to conform their conduct to the proscriptions of the law." *Id. at* 273 (citing *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999)).

Where, as here, the statute at issue is an economic regulation, "a less strict vagueness test" applies because plaintiffs like those here can be "expect[ed] to consult relevant legislation in advance of action or to seek clarification from appropriate administrative sources when necessary." *Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Env't Control*, 317 F.3d 357, 366-67 (4th Cir. 2002) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982)) (internal quotation marks omitted). Similarly, "[l]ess clarity is required in purely civil statutes because the 'consequences of imprecision are qualitatively less severe.'" *Id*. (quoting *Hoffman Estates*, 455 U.S. at 499).

Plaintiffs contend that the Court should apply a relatively strict test because the penalties in Senate Bill 334 are "quasi-criminal" and have a stigmatizing effect. Senate Bill 334 authorizes civil penalties between $500 and $10,000 per violation, as well as injunctive relief against providers. § 16-64–9. Although the Court agrees that these penalties are substantial, it cannot conclude that they are so severe that the Court must apply the same level of scrutiny afforded to criminal statutes. *Cf. Sessions v. Dimaya, 138 S. Ct. 1204,* 1212-13 *(2018)* (applying the most exacting vagueness standard to a civil statute authorizing a respondent's removal from the United States).

Moreover, when considering the draft rule, it appears that OHFLAC will reserve the harshest penalties for misrepresentation or fraud. Both of these offenses would require the agency to conclude that the provider acted intentionally. It is well-established that such a "scienter requirement may mitigate a law's vagueness . . . . " *United States v. Hsu*, 364 F.3d 192, 197 (4th Cir. 2004) (quoting *Hoffman Estates*, 455 U.S. at 499). This is especially true when the law requires proof of intentional misconduct, which eliminates "the risk of holding a person [] responsible for conduct which he could not reasonably understand to be proscribed." *Id*. (quoting *United States v. Sun*, 278 F.3d 302, 308-09 (4th Cir. 2002) (internal quotation marks omitted). Therefore, to the extent that OHFLAC's emergency rule reserves its harshest penalties for intentional misconduct, it has mitigated Senate Bill 334's vagueness and relaxed the applicable level of scrutiny.

> i.  *Senate Bill 334 is not irreconcilable with House Bill 2500.*

On the same night that the Legislature passed Senate Bill 334, it passed House Bill 2500, an act relating to "statewide uniformity for auxiliary container regulations." Although this legislation is quite different from Senate Bill 334, the two bills purport to create identical sections

within the West Virginia Code: §§ 16-63–1-3. While this certainly creates some degree of confusion, the Court cannot conclude that it violates Plaintiffs' due process rights because Defendants have demonstrated that this conflict will be quickly resolved by action of the House Clerk to designate the Act as Article 64. This renumbering has been utilized for many years, recognizing that the Legislature cannot know prior to the Governor's action whether an enrolled bill will become law. Renumbering a newly enacted article, as was done here, is unlike those cases where the legislature enacted conflicting versions of actual text. *See Willey v. Toppings*, 556 S.E.2d 818 (W. Va. 2001).

Defendant Steve Harrison, the Clerk of the House of Delegates and Keeper of the Rolls, submitted an affidavit explaining that it is commonplace for the Legislature to enact multiple pieces of legislation that create the same article. *Harrison Aff.*, ECF No. 14-2. According to Harrison, each drafter must use the next available article number because he or she cannot know which bills will ultimately become law. Following the legislative session, the Office of the Clerk prepares a code conflict report showing the redesignation of new articles based on the order in which the Legislature passed the bills. The Office of the Clerk then sends the code conflict report with the redesignated article numbers to Legislative Services (which maintains the unofficial online code on the Legislature's website) and third-party code publishers.

Here, the Office of the Clerk utilized this process to redesignate Senate Bill 334 as W. Va. Code § 16-64-1 *et seq*. Although some conflict may remain on the West Virginia Legislature's website (*see Jones Aff.* ¶ 20, ECF No. 1-1), Harrison has affirmed that Legislative Services intends to resolve that conflict on the effective date of the Bill. Given this evidence, the Court finds that Senate Bill 334 does not conflict with House Bill 2500, and that Plaintiffs' claims premised on that alleged conflict are not likely to succeed on the merits.

### ii. § 16-64–10(d) is not impermissibly vague.

Plaintiffs argue that, even if Senate Bill 334 can be reconciled with House Bill 2500, § 16-64–10(d) is impermissibly vague.[2] Specifically, Plaintiffs advance two arguments arising from the first sentence of that subsection, which reads: "Upon passage, any existing provider not offering the full array of harm reduction services as set forth in this section shall cease and desist offering all needle exchange services." § 16-64–10(d). First, Plaintiffs say that it is unclear when they must cease and desist, reasoning that the language "[u]pon passage" is impermissible because the statute was not set to go into effect until 90 days *after* its passage. Second, Plaintiffs assert that it is unclear which requirements they must comply with before January 1, 2022, because there are no "harm reduction services" provided in § 16-64–10.

Although the Court agrees that this section reflects poor draftsmanship, it cannot conclude that these inconsistencies render the language so vague as to violate Plaintiffs' due process rights. To the extent that the Bill attempts to require compliance before its own effective date, the Court finds that such language cannot have any effect because the Legislature did not expressly seek retroactive enforcement. *See West Virginia Consol. Pub. Ret. Board v. Robert Clark*, No. 20-0350, 2021 WL 2412760, at *11 (W. Va. June 14, 2021) ("A statute that diminishes substantive rights or augments substantive liabilities should not be applied retroactively to events completed before the effective date of the statute (or the date of enactment if no separate effective date is stated) unless the statute provides explicitly for retroactive application."). Defendants concede this point. *Defs.' Resp. in Opp*. 10, ECF No. 34. Setting aside this impermissible application of the statute, it

---

[2] Plaintiffs and Amici also allege that the Bill's new restrictions on sterile syringe services are constitutionally problematic. However, the Government has indicated that those new restrictions are not effective until January. Therefore, even if the Court were to agree with these allegations, it has no bearing on the pending Motion for Emergency Relief.

becomes clear that Plaintiffs must cease and desist from offering all needle exchange services, unless they offer the "full array of harm reduction services," on the effective date of the Bill.

As to the scope of "harm reduction services," the Court must read § 16-64–10(d) within the context of the entire statute. "Harm reduction program" is defined under § 16-64–1, while § 16-64–3(a) further provides that all such programs must offer ten specific services. Plaintiffs do not argue that either section is vague. In fact, the only other requirements Plaintiffs specifically identified as vague are codified under § 16-64–3(b). According to Defendants, these sections are not enforceable until January 1, 2022. The Court will enforce that representation if necessary, and leaves open the possibility that § 16-64–3(b) may be applied, in fact, unconstitutionally. However, at this phase of the litigation, the Court cannot conclude that Plaintiffs have met the high standard for a preliminary injunction.

Defendants argue that OHFLAC's emergency rule will further clarify the statute. After the hearing, Defendants tendered an updated emergency rule that sought to address Plaintiffs' concerns about vagueness. *Marra Aff.* ¶ 4, ECF No. 26-1. For example, OHFLAC clarifies: "As used in this rule and in W.Va. § 16-64-10(d), 'full array of harm reduction services' means those harm reduction services stated in W. Va. Code §16-64-3(a)." *Id.*

Plaintiffs argue the rule should have no bearing on the Court's analysis. Specifically, Plaintiffs argue that OHFLAC does not have the authority to promulgate the draft rule because the Legislature improperly directs OHFLAC to promulgate an emergency rule before the effective date of the statute. Although the Court has not determined whether the Defendants' draft rule complies with the emergency rule procedure under the West Virginia Administrative Procedure Act, it need not resolve that question at this juncture because the statute is sufficiently clear on its own. Plaintiffs have not alleged that the emergency rule itself violates their constitutional or other

rights, and instead assert that the question would be better addressed after the rules are promulgated. *Pls.' Obj. to Mot. to Supp*. 2 n.1. Therefore, the Court has no other ground to consider this question.[3]

### *Count II—Procedural Due Process*

Plaintiffs argue that § 16-64–10 violates their procedural due process rights by imposing two competing requirements. On the one hand, subsection (b) requires providers "to notify the participant of the closure of the service, prior to closure, in a conspicuous location, and provide an individual with a transition of care plan." On the other hand, subsection (d) requires that the providers to "cease and desist offering all needle exchange services" upon passage. Plaintiffs argue that it was impossible for them to immediately cease and desist offering all needle exchange services upon the Bill's passage on April 10, 2021, while also providing prior notice of that closure.

Although the Court again agrees with Plaintiffs that this section was poorly drafted, it is obligated to avoid statutory interpretations that lead to absurd or unconstitutional results if "alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). Defendants have provided such an alternative. According to Defendant Jolynn Marra, the Interim Inspector General and Director of the OHFLAC, the agency will not adopt an interpretation of the statute that would penalize providers for failing to give notice in advance of closing its syringe services pursuant to subsection (d):

---

[3] In their objection to Defendants' Motion to Supplement, Plaintiffs request clarification on "whether or not Defendants are restricted from supplementing or revising the proposed emergency rule beyond what has been proffered by Defendants in yesterday's filing." *Pls.' Obj. to Defs.'s Mot. to Supp*. 6, ECF No. 28. As noted above, the Court has no authority to preclude OHFLAC from promulgating the rule because that issue was only raised within the context of Plaintiffs' Due Process challenge to the statute. The Court has no other ground upon which to evaluate OHFLAC's authority under § 16-64–7.

> [QUESTION by Ms. Stark:] So how can a provider provide notice prior to closure when it has already closed and be in compliance of the law? Has it not violated the law one way or the other?
>
> [ANSWER by Ms. Marra:] Well, the intent was for us to file the law and file it on July 1st, but we weren't able to do that. So they would have to then make, you know, posting of it on their door and work with their patients and work towards finding another placement for those individuals.
>
> Because, again, they can't abandon their patients, but they must close. And I think any reasonable person who reads the full statute and full emergency rule would agree that if they have that plan in place with the time frames, then it might be a technicality, *but they would not be fined or punished for trying to follow the law as well as not abandoning their patients*.

*Id.* at 63:19-64:15 (emphasis added). Consistent with that testimony, OHFLAC has amended the proposed emergency rule to state: "[t]hese syringe service programs may continue in operation for the sole purpose of referring current participants to other syringe services programs." *Marra Aff*. ECF No. 26-1.

The Court finds that Marra's testimony and OHFLAC's proposed rule present a viable interpretation which affords providers flexibility in meeting the notice and transition of care plan requirements. Based on this interpretation and the Court's prior conclusion that OHFLAC cannot enforce the cease and desist order retroactively, the Court concludes that Plaintiffs are not likely to succeed on Count I. That said, the Court again observes that the Defendants' representations, as indicated by Marra's testimony and OHFLAC's latest iteration of the emergency rule, may be enforceable.

### *Count III—Equal Protection*

Plaintiffs next argue that § 16-64–10(d) is discriminatory because it grants a grace period to new, but not existing, providers. Specifically, Plaintiffs complain that an existing provider must cease and desist all operations unless it offers a "full array of harm reduction services," while a new provider need not offer the same until January 1, 2022.

Defendants assert that Plaintiffs' reading is mistaken and that the section actually benefits existing providers. According to Defendants,

> new providers also cannot offer needle exchange services without offering the full array of required harm reduction services. Indeed, new providers cannot operate at all until they obtain a license from the Office for Health Facility Licensure and Certification (see W. Va. Code § 16-64-2(a)) and to be approved for a license, a provider must offer the full array of required harm reduction services (see W.Va. Code § 16-64-3(a))"

*Defs.' Resp. in Opp.* 11, ECF No. 14.

However, the plain text of the law does not explicitly require new providers to offer the full array of harm reduction services or obtain a license before January 1, 2022. Indeed, § 16-64–10(d) suggests the opposite. That section exempts new providers from "compliance with the provisions of this section" until January 1, 2022, but makes no explicit reference to first having the harm reduction services or a license.[4]

Defendants' reliance on § 16-64–2(a) is also misplaced. Although that section does require providers to obtain a license from OHFLAC, it is unclear how that requirement can apply notwithstanding § 16-64–10(d). Moreover, even if it did apply notwithstanding § 16-64–10(d), it is unclear how Defendants can conclude that this section only applies to new providers, given that it expressly states "[a]ll *new and existing* syringe services programs shall obtain a license from [OHFLAC]." § 16-64–2 (a) (emphasis added). Accordingly, the Court rejects Defendants' reading of the statute.

Having concluded that the statute may be read to discriminate between new and existing providers, the Court must next consider whether there is a rational basis to justify that

---

[4] Although there is some uncertainty surrounding the Legislature's use of the term "section" here, the Court assumes that the Legislature intended the grace period to apply to the entire Syringe Services Act. If the Court were to hold that the Legislature only intended the grace period to apply to § 16-64–10(d), then existing providers offering the full array of harm reduction services would also be required to obtain a license to operate under § 16-64–2(a). This is clearly contrary to the Legislature's intent.

discrimination.[5] Defendants do not attempt to articulate a justification, likely because any such argument would undermine their position that stricter restrictions apply to new providers. Consequently, the Court finds that Plaintiffs are likely to succeed on the merits of this claim.

### *Counts IV- VI—West Virginia Constitution*

The remaining three claims each allege violations of the West Virginia Constitution. To the extent that Defendants' sovereign immunity under the Eleventh Amendment does not preclude these claims, the Court concludes that they are not likely to have merit.

Under Counts IV and V, Plaintiffs claim that Senate Bill 334 violates the constitutional provision that "[n]o act hereafter passed, shall embrace more than one object, and that shall be expressed in the title." W. Va. Const. art. VI, § 30. However, this claim relies on Plaintiffs' argument that Senate Bill 334 is irreconcilable with House Bill 2500, which the Court rejected above. Accordingly, this Court again concludes that claims premised on that conflict are not likely to succeed.

Plaintiffs' final claim, Count VI, alleges that the Clerk's redesignation of the Syringe Services Program Act exceeded his limited authority "to correct errors and omissions" and violates of the separation of powers clause under the West Virginia Constitution. The Court finds that Plaintiffs have failed to identify any legal authority to support this claim. Plaintiffs' only proffer letters which indicate that "it has been ordinary practice for the Governor to return to the legislature bills with objections, including objections relating to title deficiencies or typographical issues." *Am. Verified Compl.* ¶ 119. However, those letters are inapposite because the conflict resolved by the Clerk was not a typographical error. Therefore, Plaintiffs are not likely to succeed on the merits

---

[5] The parties agree that rational basis review applies. *Defs.' Resp. in Opp.* 12, ECF No. 14; *Pls.' Reply* 12-13, ECF No. 17.

of this claim.

B. **Irreparable Harm**

Plaintiffs' primary argument for irreparable harm stems from their due process claims. As held above, however, those claims are not likely to succeed on the merits. Aside from those arguments, Plaintiffs Koeppel, Lemire, and Ware state that they will suffer irreparable harm if the law goes into effect because § 16-64–10(d) will force them to stop providing sterile syringe services. In fact, they attest that they already stopped those services out of an abundance of caution. But many of the requirements viewed as onerous by the Amici and Plaintiffs are not included in the "array of harm reduction services" being immediately imposed on existing needle exchange services.[6] Although the Court sympathizes with Plaintiffs' and Amici's concern for the community and commends their commitment to public health, it must view Plaintiffs' allegations within the context of the only claim upon which they are likely to succeed—equal protection. When viewed under this lens, Plaintiffs' injury is more appropriately characterized as one of discriminatory enforcement.

However, as explained above, OHFLAC does not intend to permit new providers to operate without a license before January 1, 2022. In fact, OHFLAC's most recent draft of the emergency rule explicitly requires any new provider to "apply for an initial license not less than 30 days and not more than 60 days before the syringe service program begins operation as part of a harm reduction program." *Marra Aff.*, ECF No. 26-1. Although the Court does not decide whether OHFLAC can enforce the licensing requirement against new providers notwithstanding § 16-64–

---

[6] For example, Laura Jones, testified during the preliminary injunction hearing that she believes that at least five requirements are vague, including those concerning: licensing, participant residency, participant identification, the service's 1:1 goal, and penalties. With the exception of the penalties section, none of the other requirements will go into effect until January 1, 2022.

10(d), as discussed above, none of the Plaintiffs have standing to challenge that enforcement because all are considered "existing providers." Therefore, the Court has no occasion upon which to reject OHFLAC's position. Given these findings, the Court cannot conclude that Plaintiffs will be irreparably harmed without injunctive relief. [7]

### IV. CONCLUSION

For the reasons stated above, the Court **DISSOLVES** the June 28, 2021, Temporary Restraining Order (ECF No. 11), and **GRANTS** Defendants' Motion to Supplement the Record (ECF No. 26).

The Clerk is **DIRECTED** to send a copy of this Order to counsel of record and any unrepresented parties.

ENTERED: July 15, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

[7] Even if the Court were to grant injunctive relief, it cannot conclude that Plaintiffs are entitled to the relief they seek. Although the Court may invalidate a statute "to the extent that it reaches too far," it must leave as much of the law intact as possible. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006). As such, "partial, rather than facial, invalidation is the required course." *Id.* (internal quotation marks omitted). As explained above, the Legislature's intention was to preclude *any* provider from operating a needle exchange service without the full array of services before January 1, 2022. The Court must be mindful of that intention. Accordingly, the appropriate remedy would not be to invalidate the entire act or even the cease and desist language. Rather, the Court would be required to enjoin the Defendants from the unconstitutional application by requiring that it enforce the cease and desist order against *all* providers not offering the full array of harm reduction services.